# ALASKA AIRLINES, INC., ET AL. v. BROCK, SECRE-TARY OF LABOR, ET AL.

No. 85–920.   Argued December 1, 1986—Decided March 25, 1987

BLACKMUN, J., delivered the opinion for a unanimous Court.

*William T. Coleman, Jr.*, argued the cause for petitioners. With him on the briefs were *Donald T. Bliss* and *John H. Beisner*.

*Deputy Solicitor General Cohen* argued the cause for respondents. With him on the brief for the federal respondents were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Assistant Attorney General Spears, Lawrence S. Robbins,* and *Douglas Letter. Gary Green, Eugene B. Granof,* and *George B. Dreisen* filed a brief for respondent Air Line Pilots Association. *Matthew H. Finucane* filed a brief for respondent Association of Flight Attendants. *William J. Birney* and *William G. Mahoney* filed a brief for respondents Brotherhood of Railway and Airline Clerks et al.*

*\*Robert M. Weinberg* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

JUSTICE BLACKMUN delivered the opinion of the Court.

In *INS* v. *Chadha*, 462 U. S. 919 (1983), this Court held unconstitutional the congressional-veto provision in § 244 (c)(2) of the Immigration and Nationality Act, 66 Stat. 216, as amended, 8 U. S. C. § 1254(c)(2), and found it severable from the remainder of that Act. Petitioners, 14 commercial airlines, in the present case contend that provisions protecting employees in the Airline Deregulation Act of 1978 (Act), 92 Stat. 1705 (codified at various sections of Title 49 U. S. C. App.), are ineffective because § 43(f)(3) of the Act, 92 Stat. 1752, 49 U. S. C. App. § 1552(f)(3), similarly subjects to a legislative veto implementing regulations issued by the Department of Labor (DOL). We granted certiorari, 475 U. S. 1044 (1986), to consider whether that legislative-veto provision is severable from the remainder of the Act.

I

After 40 years of extensive regulation of the commercial-airline industry by the Civil Aeronautics Board (CAB), Congress in 1978 decided to make "a major change and fundamental redirection as to the manner of regulation of interstate and overseas air transportation so as to place primary emphasis on competition." S. Rep. No. 95–631, p. 52 (1978). Congress abandoned the industrywide fare structure gradually, § 37(a), 49 U. S. C. App. § 1482(d); altered the procedures by which airlines could enter new markets, §§ 7 and 8, 49 U. S. C. App. §§ 1371(c) and (d); and phased out the regulatory power of the CAB, eliminating the agency altogether in 1984, § 40(a), 49 U. S. C. App. §§ 1551(a)(1)(A) and (a)(3).

Congress sought to ensure that the benefits to the public flowing from this deregulation would not be "paid for" by airline employees who had relied on the heavily regulated nature of the industry in deciding to accept and to retain positions with commercial air carriers. In order to assist employees dislocated as a result of deregulation, Congress enacted an Employee Protection Program (EPP) as § 43 of

the Act, 49 U. S. C. App. § 1552.  The EPP provides for benefits, in the event of work force reductions, to "protected employees," who are defined as employees who had been employed by a certified carrier for at least four years as of October 24, 1978, the date the Act became effective.  §§ 43(d) and (h)(1).

The first part of the EPP establishes a monthly compensation program.  If an airline is forced to make severe work force reductions or to enter bankruptcy as a result of deregulation, furloughed or terminated eligible "protected employees" are entitled to federally provided monthly assistance payments.  §§ 43(a)–(c), (e).[1]  The Secretary of Labor is directed to promulgate guidelines to be used in determining the amount of the monthly assistance payments.  § 43 (b)(1).  The assistance, however, is expressly made "subject to such amounts as are provided in appropriation Acts."  § 43 (a)(1).  No funds have ever been appropriated and the assistance program has never become operative.  It is not at issue here except insofar as it is relevant to the intent of Congress in providing a legislative veto.

The second portion of the EPP imposes on airlines certified under the prior regulatory system a "duty to hire" protected employees.  If a protected employee is "furloughed or otherwise terminated," other than for cause, within 10 years of the enactment date of the statute, that employee has a "first right of hire, regardless of age, in his occupational specialty" with any carrier, covered by the section, who is "hiring additional employees."  A hiring airline is permitted, however,

---

[1] A protected employee is "eligible" for monthly assistance if he has been deprived of employment or adversely affected with respect to compensation as a result of a "qualifying dislocation."  Any employee terminated for cause is ineligible.  § 43(a).  A "qualifying dislocation" is a bankruptcy or "major contraction" of an air carrier previously certified by the CAB occurring during the first 10 complete calendar years following enactment of the Act, the major cause of which is the change in regulatory structure provided by the Act.  § 43(h)(2).  A major contraction is defined as a work force reduction of at least 7½% within a 12-month period.  § 43(h)(4).

first to recall any of its own previously furloughed employees. § 43(d)(1). The Act also places on the Secretary the responsibility to assist protected employees in finding other employment and empowers the Secretary to require air carriers to file information necessary to provide this assistance. § 43(d)(2).

The Secretary "may issue, amend, and repeal such rules and regulations as may be necessary for the administration of [the EPP]." § 43(f)(1). The Act provides that the rule containing the guidelines for monthly assistance payments and "any other rules or regulations which the Secretary deems necessary to carry out this section shall be promulgated within six months after October 24, 1978." § 43(f)(2). Congress also included a "report and wait" provision, specifying that no final rule or regulation may be issued until 30 legislative days after it has been submitted to the Senate Committee on Commerce, Science, and Transportation and the House Committee on Public Works and Transportation. § 43(f)(3). Finally, the EPP contains the legislative-veto provision which gave rise to this litigation. It declares that any final rule issued pursuant to § 43 shall be submitted to Congress and shall become effective after 60 legislative days, unless during that 60-day period either House of Congress adopts a resolution disapproving the rule. § 43(f)(3).[2]

## II

Petitioners are certified carriers subject to the duty-to-hire provisions of the Act and to the regulations promulgated by the Secretary.[3] They challenged the EPP in the United

---

[2] If both Houses adopt an approval resolution during the 60-day period, the rule becomes effective immediately. § 43(f)(3).

[3] The Act became law on October 24, 1978. In March 1979, the Secretary proposed regulations for both the financial-assistance and duty-to-hire provisions of the EPP. 44 Fed. Reg. 19146. Revised proposed regulations relating only to the duty to hire were published in September 1982. 47 Fed. Reg. 41304. The final rules were promulgated and submitted to

States District Court for the District of Columbia, contending that the legislative-veto provision in § 43 is unconstitutional under *Chadha*, and that the entire program must be invalidated because the veto provision is nonseverable from the rest of the EPP. Respondent employee unions intervened on behalf of the Secretary. The District Court granted summary judgment for petitioners, striking down the entire EPP, but leaving the remainder of the Act intact. *Alaska Airlines, Inc.* v. *Donovan*, 594 F. Supp. 92 (1984). It held the legislative-veto provision unconstitutional and ruled that it could not be severed from the EPP. Respondents appealed the finding of nonseverability. The United States Court of Appeals for the District of Columbia Circuit reversed, holding that the legislative-veto clause is severable from the remainder of the EPP program.[4] *Alaska Airlines, Inc.* v. *Donovan*, 247 U. S. App. D. C. 132, 766 F. 2d 1550 (1985). We agree and affirm the judgment of the Court of Appeals.[5]

---

Congress in November 1983, 48 Fed. Reg. 52854, and but for this litigation would have become effective.

[4] The Court of Appeals remanded the case to the District Court for consideration of petitioners' remaining challenges to the DOL regulations. These are not at issue here. 247 U. S. App. D. C. 132, 137, 766 F. 2d 1550, 1565 (1985). The District Court sustained all but one of the regulations. 632 F. Supp. 178 (1986). It remanded to the Secretary "for further explanation" of the issue whether 29 CFR § 220.21(a)(1) (1986), dealing with the initial hiring age of flight officers and pilots, was valid in the light of the carriers' obligation to maintain air safety. 632 F. Supp., at 184. The Court of Appeals reversed in part. 258 U. S. App. D. C. 89, 809 F. 2d 930 (1987) (Table). In an unpublished memorandum it held that the remand of this issue was inappropriate because "Congress made it absolutely clear," § 43(d)(1), that the hiring preference should apply "regardless of age." The Court of Appeals remanded for agency clarification of a different issue: the scope of the exception to the duty to hire created by an equal-opportunity agreement as established by 29 CFR §§ 220.29 and 220.01(j) (1986). With the exception of these provisions, the duty-to-hire regulations are now in force.

[5] Petitioners contend that the Court of Appeals lacked jurisdiction because the District Court held "an Act of Congress unconstitutional," which

## III

"[A] court should refrain from invalidating more of the statute than is necessary. . . . '[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid.'" *Regan* v. *Time, Inc.,* 468 U. S. 641, 652 (1984) (plurality opinion), quoting *El Paso & Northeastern R. Co.* v. *Gutierrez,* 215 U. S. 87, 96 (1909). The standard for determining the severability of an unconstitutional provision is well established: "'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'" *Buckley* v. *Valeo,* 424 U. S. 1, 108 (1976) *(per curiam),* quoting *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma,* 286 U. S. 210, 234 (1932). Accord: *Regan* v. *Time, Inc.,* 468 U. S., at 653; *INS* v. *Chadha,* 462 U. S., at 931–932; *United States* v. *Jackson,* 390 U. S. 570, 585 (1968).

Congress could not have intended a constitutionally flawed provision to be severed from the remainder of the statute if the balance of the legislation is incapable of functioning independently. See, *e. g., Hill* v. *Wallace,* 259 U. S. 44, 70–72 (1922) (Future Trading Act held nonseverable because valid and invalid provisions so intertwined that the Court would have to rewrite the law to allow it to stand). This is not a concern, however, when the invalid provision is a legislative veto, which by its very nature is separate from the operation

holding must therefore be appealed directly to this Court pursuant to 28 U. S. C. § 1252. The issue at hand, however, is not the constitutionality of the remaining provisions, but their severability from the unconstitutional legislative-veto provision, which is a question of legislative intent. The appeal was properly taken to the Court of Appeals pursuant to 28 U. S. C. § 1291. See *EEOC* v. *Allstate Insurance Co.,* 467 U. S. 1232 (1984); *Heckler* v. *Edwards,* 465 U. S. 870, 885 (1984).

of the substantive provisions of a statute. Indeed, when Congress enacted legislative-veto provisions, it contemplated that activity under the legislation would take place so long as Congress *refrained* from exercising that power.[6] The independent operation of a statute in the absence of a legislative-veto provision thus could be said to indicate little about the intent of Congress regarding severability of the veto.

The more relevant inquiry in evaluating severability is whether the statute will function in a *manner* consistent with the intent of Congress. In considering this question in the context of a legislative veto, it is necessary to recognize that the absence of the veto necessarily alters the balance of powers between the Legislative and Executive Branches of the Federal Government. Thus, it is not only appropriate to evaluate the importance of the veto in the original legislative bargain, but also to consider the nature of the delegated authority that Congress made subject to a veto. Some delegations of power to the Executive or to an independent agency may have been so controversial or so broad that Congress would have been unwilling to make the delegation without a strong oversight mechanism. The final test, for legislative vetos as well as for other provisions, is the traditional one: the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.[7]

---

[6] See Hearings on the Supreme Court Decision in INS v. Chadha and Its Implications for Congressional Oversight and Agency Rulemaking, before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary, 98th Cong., 1st Sess., 138 (1983) (remarks of Rep. Berman) ("[I]t's hard for me to envision a statutory enactment that probably couldn't be viewed as fully operative, even though the legislative veto was struck down. It would just be a different kind of operation that Congress contemplated").

[7] Petitioners argue that the Court of Appeals formulated a completely new standard for severability. They rest this argument on the court's statement that an invalid portion of a statute may be severed unless, "as the Temporary Emergency Court of Appeals would put it," it is proved

The inquiry is eased when Congress has explicitly provided for severance by including a severability clause in the statute. This Court has held that the inclusion of such a clause creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision. See *INS* v. *Chadha*, 462 U. S., at 932; *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma*, 286 U. S., at 235. In such a case, unless there is strong evidence that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute. In the absence of a severability clause, however, Congress' silence is just that—silence—and does not raise a presumption against severability. See *Tilton* v. *Richardson*, 403 U. S. 672, 684 (1971) (plurality opinion); *United States* v. *Jackson*, 390 U. S., at 585, n. 27.

In this case, the parties disagree as to whether there is a severability clause applicable to the EPP.[8] We need not re-

---

"that Congress would have preferred no airline employee protection provision at all to the existing provision *sans* the veto provision." 246 U. S. App. D. C., at 143, 766 F. 2d, at 1561. See *Gulf Oil Corp.* v. *Dyke*, 734 F. 2d 797, 804 (Temp. Emerg. Ct. App.), cert. denied, 469 U. S. 852 (1984). Petitioners interpret this statement as a signal that the court asked whether Congress would have enacted *some* form of protection for airline employees, rather than whether Congress would have enacted the same protections currently found in the Act. Any such inquiry, of course, would be tautological, as Congress' intent to enact a statute on the subject is apparent from the existence of the EPP in the Act. We find the Court of Appeals' language to be completely consistent with the established severability standard. Even if one had doubts, when the court's analysis is viewed in its entirety, it is plain that the correct standard was applied in this case.

[8] The Airline Deregulation Act of 1978 does not contain a severability clause, but it amends the Federal Aviation Act of 1958, 72 Stat. 731, which does contain such a clause. See § 1504, 72 Stat. 811; see also note following 49 U. S. C. App. § 1301 (Separability of Provisions). The applicability of this clause to § 43 is in doubt, however, because, unlike many sections of the Deregulation Act, the EPP does not amend provisions of the Aviation Act or any other pre-existing statute, but instead establishes a new program. See note following 49 U. S. C. App. § 1552 (Codification: "Section

solve this question, for there is no need to resort to a presumption in order to find the legislative-veto provision severable in this case. There is abundant indication of a clear congressional intent of severability both in the language and structure of the Act and in its legislative history.

## IV

### A

Congress' intent that the EPP's first-hire provisions should survive in the absence of the legislative-veto provision is suggested strongly by the affirmative duty the statute places directly on air carriers. The first-hire portion of the EPP establishes in detail an obligation to hire protected employees that scarcely needs the adoption of regulations by the Secretary, and thus leaves little of substance to be subject to a veto. Section 43(d), 49 U. S. C. App. § 1552(d), designates the recipients of this "first right of hire," namely, employees defined by the Act as "protected," who are furloughed or terminated, other than for cause, during the first 10 years of deregulation. It also specifies the class of carriers that are obligated and the extent of the obligation. Carriers previously regulated by the CAB have a duty to hire protected employees before they hire any other person, although they may first recall their own employees. The preference is limited to an individual's occupational specialty and applies without regard to age. The language of these provisions is sufficiently unambiguous to notify carriers of their responsibilities and sufficiently detailed to require little further action on the part of the Secretary.[9]

Congress did direct the Secretary to take certain actions with regard to the EPP's first-hire provisions: he is to estab-

---

[43] was enacted as part of the Airline Deregulation Act of 1978, and not as part of the Federal Aviation Act of 1958 which comprises this chapter").

[9] A similar conclusion was reached in McDonald v. Piedmont Aviation, Inc., 625 F. Supp. 762, 766 (SDNY 1986), which sustained a private action brought by an individual pilot claiming the defendant carrier wrongfully denied him first right of hire under § 43.

lish and periodically to publish a list of available jobs, to "make every effort" to assist protected employees in finding employment, and to encourage negotiations in rehiring and seniority. He also may require air carriers to file data necessary to fulfill these duties. §§ 43(d)(2) and (3). These obligations on the part of the Secretary are obviously designed merely to facilitate the obligation to hire imposed upon certain carriers, and their ancillary nature is further evidence that Congress delegated only limited substantive discretion to the Secretary. With this subsidiary role allotted to the Secretary, the veto provision could affect only the relatively insignificant actions he might take in connection with the duty-to-hire program.[10] There is thus little reason to believe that Congress contemplated the possibility of vetoing any of these actions and one can infer that Congress would have been satisfied with the duty-to-hire provisions even without preserving the opportunity to veto the DOL's regulations.

Moreover, Congress did not link specifically the operation of the first-hire provisions to the issuance of regulations. While the Secretary is explicitly directed to promulgate, by rule, guidelines for the assistance payments authorized by

---

[10] The independent functioning of the Act's first-hire provisions stands in contrast to the important role of the Secretary in the monthly assistance program. The Secretary is the individual responsible for making the payments to individuals found by the Secretary to be eligible protected employees. § 43(a)(1). The Act designates that monthly assistance payments shall be made until the employee obtains other employment, for a maximum of 72 months, § 43(e), but delegates to the Secretary the task of determining the amount of the payments. He is directed by the Act to issue guidelines to be used by him in determining the amount of each monthly assistance payment for each class and craft of employees. § 43 (b)(1). He also has the responsibility to determine and reimburse "reasonable moving expenses" and losses resulting from the sale of a principal residence at a price below its fair market value. § 43(c). The compensation program, however, could be controlled through appropriations, see § 43 (a)(1), which diminishes the need for Congress to retain other means of preventing the Secretary's regulations from taking effect.

the EPP, § 43(b)(1),[11] there is no similar command with regard to the duty-to-hire provisions. The Act simply provides that the Secretary "may" issue such regulations as are necessary to the administration of the program. § 43(f)(1). A duty to hire that is not dependent upon the issuance of regulations is unlikely to be dependent upon an opportunity for Congress to veto those regulations.

The regulations eventually promulgated by the DOL, 29 CFR § 220.01 *et seq.* (1986), support the conclusion that Congress itself elaborated most of the details necessary for the first-hire program. The regulations reiterate the statutory requirements and provide a limited administrative appeal for ascertaining eligibility in the event of a dispute, § 220.26, but are otherwise silent as to a mechanism for enforcing the right of hire. The primary focus is on mechanical details—notices to be sent, information to be published, and procedures to be followed. See, *e. g.*, §§ 220.23, 220.25, and 220.27. Most importantly, in the regulations themselves the DOL acknowledges the duty to hire imposed directly by the Act, for the regulations are made effective *subject to* the proviso that "nothing in these regulations shall preclude the exercise of statutory rights and duties between October 24, 1978 [the enactment date of the Act], and the effective date of these regulations." § 220.01(g).

Not only do the first-hire provisions stand on their own, independent of any need for extensive regulations, but, should Congress object to the regulations issued, it retains a mechanism for the expression of its disapproval that reduces any disruption of congressional oversight caused by severance of the veto provision. The EPP's "report and wait" provision in the statute requires the Secretary to forward regulations to the Transportation Committees of both Chambers of

---

[11] In addition, the rule establishing guidelines for assistance payments is the sole rule mentioned explicitly in § 43(f)(2), which requires the Secretary to promulgate the rules necessary to "carry out" the section within six months after enactment of the Act.

Congress and to wait 30 days before issuing them as final regulations.  § 43(f)(3).  This interval gives Congress an opportunity to review the regulations and either to attempt to influence the agency's decision, or to enact legislation preventing the regulations from taking effect.[12]

In arguing that the legislative veto is nonseverable, petitioners place great significance on the fact that the EPP is the only section of the Act to delegate authority to the DOL and only rules issued pursuant to that section are subject to the veto.  We find this emphasis misplaced.  The EPP is the only aspect of the Act concerned with labor protection and thus naturally is the only provision to involve the DOL.  The fact that this is the only veto in the Act is unremarkable given the nature of the rest of the statute.  Although it did not remove completely the need for regulation,[13] the Act is

---

[12] The 95th Congress, which enacted the Airline Deregulation Act, frequently incorporated "report and wait" provisions into statutes.  For a compilation of these, see Congressional Research Service, C. Norton, 1976–1977 Congressional Acts Authorizing Prior Review, Approval or Disapproval of Proposed Executive Actions, Report No. 78–117 G, pp. 19–26 (1978); Congressional Research Service, C. Norton, 1978 Congressional Acts Authorizing Congressional Approval or Disapproval of Proposed Executive Actions, Report No. 79–46 G, pp. 16–41 (1979).

In *Sibbach* v. *Wilson & Co.*, 312 U. S. 1 (1941), the Court approved Rule 35 of the then newly promulgated Federal Rules of Civil Procedure, which had been subject to a "report and wait" provision stipulating that the Rules "shall not take effect until they shall have been reported to Congress by the Attorney General at the beginning of a regular session thereof and until after the close of such session."  Act of June 19, 1934, ch. 651, § 2, 48 Stat. 1064.  The Court stated approvingly: "The value of the reservation of the power to examine proposed rules, laws and regulations before they become effective is well understood by Congress.  It is frequently, as here, employed to make sure that the action under the delegation squares with the Congressional purpose."  312 U. S., at 15.  The statute at issue in *INS* v. *Chadha* also included notification procedures and a delay period, which this Court said would resemble a "report and wait" provision absent the one-House veto it found invalid.  462 U. S., at 935, n. 9.

[13] See, *e. g.*, § 33(a), 92 Stat. 1732 (CAB's duty to implement program ensuring adequate air service to small communities); § 12, 92 Stat. 1716

primarily a "deregulatory" statute[14] and, aside from the EPP, did not create any new programs requiring congressional oversight. Moreover, the absence of a veto clause in *other* provisions of the Act indicates nothing about whether Congress regarded the clause as essential to the duty-to-hire provisions of § 43.

B

The legislative history of the EPP supports the conclusion that Congress would have enacted the duty-to-hire provisions even without a legislative-veto provision by revealing that Congress regarded labor protection as an important feature of the Act, while it paid scant attention to the legislative-veto provision. The bill passed by the Senate contained protections for employees that later became the heart of the labor provisions in the final Act—monetary compensation for lost wages and relocation expenses, and a hiring preference within the industry. The sponsors of the primary deregulation bill, S. 689, introduced during the first session of the 95th Congress were optimistic that deregulation would lead to an increase in the number of jobs,[15] and that bill did not contain employee protections. But in response to union tes-

(CAB's authority to issue rules modifying automatic entry program); §§ 5 and 33(a), 92 Stat. 1709 and 1738 (Secretary of Transportation's and FAA Administrator's duty to establish aircraft safety standards).

[14] As petitioners acknowledge, the Act has the stated purpose of placing "maximum reliance on competitive market forces." § 3(a)(4), 92 Stat. 1706, 49 U. S. C. App. § 1302(a)(4). See Brief for Petitioners 29–30.

[15] See Hearings on S. 292 and S. 689, Regulatory Reform in Air Transportation, before the Subcommittee on Aviation of the Senate Committee on Commerce, Science, and Transportation, 95th Cong., 1st Sess., pt. 1, p. 110 (1977) (Senate Deregulation Hearings) (remarks of Sen. Kennedy); *id.*, at pt. 4, p. 1844 (remarks of Sen. Cannon). During floor debate on the final Act, Senator Kennedy stated that "the indicators are all positive, and employment will continue to increase as the carriers respond to the changes and new opportunities deregulation has brought." 124 Cong. Rec. 37419 (1978). See also *id.*, at 10677 (statement of Sen. Cannon).

timony that the existing protections were inadequate,[16] and the support for labor-protection provisions expressed by administration witnesses,[17] the compensation program and first-hire provisions were added as § 22 of S. 2493, the bill introduced in the second session. With the inclusion of the labor provisions, the bill was viewed as "strik[ing] the proper balance between the legitimate demands of industry, consumers, labor, and management." 124 Cong. Rec. 10654 (1978) (remarks of Sen. Percy).

The Senate Committee Report expressed its reasons for providing protection for individual airline employees as follows:

> "[A]n individual employee will be able to do little to adjust to the new structure. Many airline employees have

---

[16] Labor protections had been provided in the airline industry in merger cases. A typical formula for employee protection included four years of supplemental compensation for those whose new jobs were at a lower salary, a dismissal allowance for up to five years for those losing their jobs, depending on length of service, and an integration of seniority lists. See *United-Capital Merger Case*, 33 C.A.B. 307, 342–347 (1961); *Allegheny-Mohawk Merger Case*, 59 C.A.B. 22, 31–40 (1972).

Union leaders urged that protections were needed in the event of bankruptcies and route discontinuations, similar to those afforded employees in the railroad industry. See, *e. g.*, Interstate Commerce Act, 49 U. S. C. § 11347 (railroad merger approval subject to "a fair arrangement" to protect employees, including provisions that employees will not be in a worse position with regard to employment for four years); Rail Passenger Service Act, 45 U. S. C. §§ 565(a) and (b) (similar protections for employees affected by route discontinuations). See Senate Deregulation Hearings, pt. 2, p. 717 (statement of Frank E. Fitzsimmons, General President, International Brotherhood of Teamsters); *id.*, at pt. 3, p. 1320 (statement of William G. Mahoney, counsel to several airline labor unions).

[17] Charles L. Schultze, Chairman of the Council of Economic Advisers, voiced President Carter's concern: "In his message to the Congress, the President made it clear that the Administration recognizes an obligation to protect the legitimate interests of airline employees." Senate Deregulation Hearings, pt. 1, p. 279; see also *id.*, at pt. 3, pp. 1369–1370 (statement of Brock Adams, Secretary of Transportation).

given most of their working lives to the air transportation industry and have too much invested to leave it now. In many cases, a job shift even within the industry would be costly because of lost seniority. Older employees looking for a new job might encounter difficulties because of their age. Since employees will not be ab[l]e to adjust in the sense their employers can, the Committee believes that a reasonable program of transition assistance should be provided.

" . . . Because it is the public who will benefit from the regulatory reform provided for in this bill, the public should be willing to assume reasonably close to the full cost of such reform, including the cost of transition for any dislocated employees. The Committee believes that the Congress, on behalf of the American people, must insure that the benefits to the public which result from its decision to alter substantially the regulation of air transportation are not paid for by a minority— the airline employees and their families who have relied on the present system." S. Rep. No. 95–631, p. 114 (1978).

In contrast to this extensive discussion of employee protection, the Committee paid scant attention to legislative oversight. When it did show concern with retaining control over the form the program would take, it was in the context of the compensation program, not the duty to hire:

"Eligible employees who lost their jobs would be entitled to monthly assistance payments for a maximum of 3 years or until they were reemployed, whichever occurred first. The amount of such payment would be equal to a percentage of former wages, as determined by regulations promulgated by the Department of Labor. *These regulations will be subject to congressional re-*

694

*view.* The committee considered setting statutory percentage figures and maximum dollar amounts, but concluded that the Secretary of Labor, after consultation with the Secretary of Transportation, will be in a better position to determine the appropriate amounts. The committee intends that the percentages chosen will result in compensation payments that are less than the employees' after-tax income in order to preserve maximum incentives for employees to secure comparable work." *Id.*, at 116–117 (emphasis added).[18]

In introducing S. 2493 on the floor, Senator Cannon discussed the EPP, but did not mention the legislative-veto power, or make note of any need for congressional oversight. 124 Cong. Rec. 10647–10649 (1978). The summary of the bill printed in the record similarly omitted any indication that the legislation contained a veto. *Id.*, at 10649. The employment provisions were discussed extensively during the floor debate on airline deregulation and support for the duty-to-hire requirement was repeatedly voiced.[19] Several amend-

---

[18] Even assuming, *arguendo*, that the legislative veto was crucial to the passage of the compensation program, all that is presently operative is the first-hire portion of the EPP, which was uncontroversial. Petitioners argue that the two portions of the EPP are tightly linked, implying that if the veto was necessary to one, it was necessary to the enactment of both. The two components were related in that the right of first hire was predicted to "decrease the cash payments required under the program," S. Rep. No. 95–631, p. 116, and the Act conditions the receipt of monthly assistance payments on cooperation with the Secretary in seeking other employment, § 43(d)(2). But this is evidence that the monthly assistance program was regarded as the second line of attack, not that the right to first hire could not stand alone. As illustrated by the current inactive status of the compensation program, the first-hire program is capable of serving as the sole means of employee protection.

[19] See, *e. g.*, 124 Cong. Rec. 10674–10675 (1978) (Sen. Zorinsky's proposal to delete the assistance program and "liberal[ize]" the duty to hire by expanding the definitions of protected employee and qualifying dislocation); *id.*, at 10677 (Sen. Cannon's endorsement of the duty-to-hire provisions as a good concept that "would insure that people have the opportunity

ments modifying the monthly assistance program, both to restrict and to liberalize payments, were offered,[20] but there was no attempt to alter the duty-to-hire program. The most dramatic endorsement of the EPP as a whole came in response to an amendment offered by Senator Hatch that would have eliminated the EPP completely. The Senate resoundingly rejected the amendment by the lopsided vote of 85–7. *Id.*, at 10679, 10682. In contrast to this emphasis on the substantive aspects of the EPP, neither supporters nor opponents of the bill ever mentioned the legislative-veto provision on the floor of the Senate.

The House bill, H. R. 12611, which lacked a legislative-veto provision, contained even more encompassing protections for displaced employees. In its § 32, it provided protections for airline workers identical to those in the rail industry and stipulated that no new authority granted by the Act could be exercised by a carrier unless the Secretary certified that employees would be protected.[21] The House adopted this bill without apparent controversy over the labor provisions and, despite the broad delegation of power to the Secretary, without any mention of congressional oversight. 124 Cong. Rec. 30661–30708 (1978).

---

to work, even though it is with another carrier"); *id.*, at 10695 (remarks of Sen. Muskie).

[20] Both weakening and strengthening amendments to the compensation program were defeated. See *id.*, at 10674–10683 (Sen. Zorinsky's amendment to delete the financial assistance component of the bill, but to leave the duty to hire intact); *id.*, at 10680–10681 (Sen. Danforth's amendment to extend the 3-year limit on monthly payments to 5 years and remove the prerequisite 15% work force reduction). One amendment was approved. See *id.*, at 10683 (Sen. Cannon's amendment deleting language that would have required the Secretary of Labor to guarantee the full-salary benefits of very highly paid employees).

[21] The House bill required "arrangements no less favorable than those in 5(2)(f) of the Interstate Commerce Act and section 405 of the Rail Passenger Service Act." H. R. Rep. No. 95–1211, p. 22 (1978).

The bill that emerged from the Conference Committee contained a version of the EPP "basically the same as the Senate bill." H. R. Conf. Rep. No. 95–1779, p. 105 (1978) (listing the differences). The debate on the final bill again illustrates the relative unimportance of the legislative-veto provision in this legislation. The only discussion of the EPP reflected wholesale approval of the program, with many Members stressing their support for the provisions,[22] or regrets that the EPP provisions were not even stronger.[23] One comment alone—in fact, the only such comment made during the entire deliberation on the Act—concerned the legislative veto.[24] This was an endorsement of the provision by Representative Levitas, which is best understood as an expression of his general support for legislative-veto provisions rather than a judgment that oversight was particularly important to the EPP.[25]

---

[22] See 124 Cong. Rec. 37416 (1978) (statement of Sen. Cannon); *id.*, at 37421 (statement of Sen. Stevenson); *id.*, at 38522 (statements of Rep. Anderson and Rep. Snyder); *id.*, at 38523 (statement of Rep. Johnson).

[23] See *ibid.* (statement of Rep. Harsha); *id.*, at 38524–38525 (statement of Rep. Mineta).

[24] Representative Levitas stated:

"Finally, Mr. Speaker, I cannot let this moment go by without making this observation. While there have been several bills sent to the President this year and signed by him which contained a provision for a congressional veto, I am happy to say that this piece of legislation contains a one-House veto over the regulations which may be issued by the Secretary of Labor on the labor protection provisions, so that the Congress and not an unelected bureaucrat will have the final word on the regulations that will have the effect of law." *Id.*, at 38524.

[25] Indeed, Representative Levitas had earlier commented favorably on the House bill (which lacked a veto provision) without any mention of a need for the veto power. See H. R. Rep. No. 95–1211, at 73 (1978) (additional views); 124 Cong. Rec. 29529–29530 (1978); *id.*, at 30671 (House bill "far superior to the bill of the other body in every respect").

Representative Levitas was an ardent supporter of the legislative veto and an acknowledged leader in the fight to establish this device. See *id.*, at 19427 (statement of Rep. Alexander). He routinely advocated its inclusion in a wide variety of statutes. See, *e. g.*, Hearings on S. 890 and

## V

The language and structure of the EPP and its legislative history provide an uncontradicted view of congressional intent with regard to severance of the legislative-veto provisions from the duty-to-hire program. This evidence leads to the conclusion that any concerns about the operation of the EPP related principally to the financial-assistance program. Even this concern was minimal. The emphasis during deliberations on the Act was placed overwhelmingly on the substantive provisions of the statute, with scant attention paid to any need for congressional oversight. In the almost total absence of any contrary refrain, we cannot conclude that Congress would have failed to enact the Airline Deregulation Act, including the EPP's first-hire program, if the legislative veto had not been included. Accordingly, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

---

S. 684, Legislative Veto Proposals, before the Subcommittee on Agency Administration of the Senate Committee on the Judiciary, 97th Cong., 1st Sess., 97 (1981); Hearings on H. R. 3658, H. R. 8231, and Related Bills, Congressional Review of Administrative Rulemaking, before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary, 94th Cong., 1st Sess., 142 (1975). He has continued in this support, holding thé view that this Court's ruling in *INS* v. *Chadha* was mistaken. See, *e. g.*, 130 Cong. Rec. 8488 (1984); *id.*, at 28059; Levitas & Brand, The Post Legislative Veto Response: a Call to Congressional Arms, 12 Hofstra L. Rev. 593, 613 (1984); Levitas & Brand, Congressional Review of Executive and Agency Actions After *Chad[h]a*: "The Son of Legislative Veto" Lives On, 72 Geo. L. J. 801 (1984).