# Severability and Duration of Appropriations Rider Concerning Frozen Poultry Regulations

A provision in the Department of Agriculture appropriations legislation for Fiscal Year 1996, providing that a regulation otherwise rendered inoperative could be put into effect if a revised version of the regulation submitted by the Secretary of Agriculture was received and approved by two committees of Congress, violates the constitutional separation of powers by purporting to provide for the legislative enactment of a regulation without bicameral passage and presentment, as required by Article I of the Constitution.

This unconstitutional provision is severable from the remainder of the section and statute in which it is contained, so that the section's prohibition against the use of appropriated funds to implement the subject regulation, and its provision that the regulation may not take effect absent authorizing legislation, are both constitutionally enforceable.

All provisions of the section, including its prohibition against the regulation taking effect absent future authorizing legislation, are limited in duration to the 1996 Fiscal Year.

June 4, 1996

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF AGRICULTURE

This responds to your letter of March 13, 1996, requesting the views of this Office regarding section 726 of the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1996, Pub. L. No. 104–37, 109 Stat. 299, 332 (1995) ("the Act"). Specifically, you have asked (1) whether section 726 is unconstitutional in whole or in part; (2) if it is unconstitutional only in part, whether the constitutionally sustainable portions are severable from the unconstitutional portion, and therefore valid and effective; and (3) whether the sustainable provisions of section 726 constitute permanent or temporary legislation.

Section 726 prohibits the use of fiscal year 1996 ("FY 1996") appropriations to implement or enforce a regulation promulgated by the Department of Agriculture ("USDA") concerning the labeling of raw poultry products. *See* Use of the Term "Fresh" on the Labelling of Raw Poultry Products, 60 Fed. Reg. 44,396 (1995). It also sets forth conditions that must be met before that regulation may legally "take effect." Section 726 provides as follows:

> None of the funds appropriated or otherwise made available by this Act may be used to develop compliance guidelines, implement or enforce a regulation promulgated by the Food Safety and Inspection Service on August 25, 1995 (60 Fed. Reg. 44396): *Provided*, That this regulation shall take effect only if legislation is enacted into law which directs the Secretary of Agriculture to promulgate such regulation, or the House Committee on Agriculture and the

232

> Senate Committee on Agriculture, Nutrition and Forestry receive and approve a proposed revised regulation submitted by the Secretary of Agriculture.

109 Stat. at 332.[1]

In a statement made upon signing the Act, the President said, "Section 726 raises constitutional concerns and I have therefore asked the Department of Justice to advise me as to the validity and enforceability of that section." 2 Pub. Papers of William J. Clinton 1690, 1691 (Oct. 27, 1995). This opinion addresses the constitutional concerns raised by the President and subsequently reiterated in your specific request for an opinion.

We conclude that the final proviso of section 726 violates the constitutional separation of powers by purporting to provide for the legislative enactment of a regulation without bicameral passage and presentment, as required by Article I of the Constitution. U.S. Const. art. I, § 7; *INS v. Chadha*, 462 U.S. 919, 952 (1983). We further conclude that this unconstitutional proviso is severable from the remainder of the section and the statute, so that section 726's prohibition against the use of appropriated funds to implement the subject regulation, and its provision that the regulation may not take effect absent authorizing legislation, are both constitutionally enforceable. Finally, we conclude that all provisions of section 726, including its prohibition against the regulation taking effect absent future authorizing legislation, are limited in duration to the 1996 Fiscal Year.

## DISCUSSION

### 1. *Enactment of Regulation by Committee Action*

When exercising its power to pass legislation, Congress must act in accordance with the procedures established in Article I, Section 7 of the Constitution: passage by both houses of Congress and presentment to the President for signature or veto. *Chadha*, 462 U.S. at 951. In *Chadha*, the Supreme Court struck down a statute that authorized either house of Congress, by passing a concurrent resolution and without presentment to the President, to veto particular decisions by the Attorney General. While acknowledging that Congress had the authority to achieve that same ultimate result through the proper exercise of its legislative power, the Court held the statute unconstitutional because Congress was exercising that authority without following the bicameral passage and presentment procedures specified in Article I.

---

[1] We note that this section is not a model of legislative clarity. For example, the proviso contains an internal contradiction in that it provides that the poultry regulation promulgated by USDA in August 1995 "shall take effect only if" the House and Senate agricultural committees receive and approve a "revised regulation" — i.e., a *different* regulation.

By its terms, the final clause of section 726 provides that an otherwise inoperative regulation proposed by USDA can be validated and enacted as a binding regulation if it is approved by two named committees of Congress. Section 726 would thus authorize these congressional committees, acting independently of the Congress as a whole and without presentment to the President, to enact a rule that governs the actions and conduct of persons outside the legislative branch. While the clause in question speaks in terms of allowing a regulation to "take effect," the actual legal effect of the committees' action would be essentially indistinguishable from the enactment of a law or statute.

Such legislative action cannot be validly accomplished by mere committees of the Congress. Therefore, the "committee approval" clause of section 726 is unconstitutional under the fundamental principles expressed in *Chadha*. Like the one-house legislative veto invalidated by that decision, section 726 violates Article I's specific requirements for the enactment of legislation. While Congress has broad authority to grant, limit, or withhold appropriations, that power may not be used — as it would be here — to circumvent the steps required by the Constitution for Congress to enact a law or regulation binding on persons outside the legislative branch.

## 2. *Severability*

Although we conclude that the committee-approval clause of section 726 is invalid, the section's primary clause barring the use of fiscal year 1996 appropriations to implement or enforce the poultry regulation would present no constitutional problem standing by itself. That raises the question whether the otherwise valid restriction on the use of appropriations is severable from the unconstitutional component of section 726.

In *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987), the Supreme Court outlined the basic principle governing such severability determinations:

> The standard for determining the severability of an unconstitutional provision is well established: Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.

(internal quotations omitted). As the Court further explained, "The final test [of severability] . . . is the traditional one: the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted." *Id.* at 685. *See also* 2 Norman J. Singer, Sutherland Statutory Construction § 44.06 (5th ed. 1992) (a portion of a statute that has been held invalid may be severed, leaving the rest to operate, unless it is evident that the

legislature considered the valid and invalid portions to be "conditions, considerations, or compensations for each other"). Only if the severance of the invalid provision would result in the creation of a law that the legislature otherwise would not have enacted should the entire statute be invalidated. *Id.* § 44.04.

Accordingly, the courts will generally presume that Congress intends the unconstitutional portion of a statute to be severed from the remainder of that statute. *See Tilton v. Richardson*, 403 U.S. 672, 684 (1971) (plurality opinion) ("'The cardinal principle of statutory construction is to save and not to destroy.'" (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 30 (1937)).[2] However, that presumption may sometimes be overcome by persuasive indications that the truncated statute remaining after severance would be incompatible with the intentions of the legislature that enacted it. *See* Memorandum for the Attorney General, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Legality of Government Honoraria Ban Following U.S. v. National Treasury Employees Union* (Feb. 26, 1996).

Significantly, on several occasions the Supreme Court has found congressional control mechanisms that violate the bicameralism and presentment requirements of *Chadha* to be severable from the constitutional portion of the statutes in question. *Chadha*, 462 U.S. at 931–35; *Alaska Airlines*, 480 U.S. at 684–85. As the Court explained in *Alaska Airlines*:

> Congress could not have intended a constitutionally flawed provision to be severed from the remainder of the statute if the balance of the legislation is incapable of functioning independently. . . . *This is not a concern, however, when the invalid provision is a legislative veto, which by its very nature is separate from the operation of the substantive provisions of [the] statute.*

*Id.* (emphasis added) (citation omitted).

This Office has previously determined that an unconstitutional "committee approval" provision similar to that at issue here is severable from other portions of the statute. *Exercise of Transfer Authority under Section 110 of H.J. Res. 370*, 6 Op. O.L.C. 520 (1982). Citing a lengthy record of "historical practice," we stressed (1) the general rule that severability is presumed unless there is evidence that Congress would not have enacted the untainted provisions independent of the tainted provision; (2) the absence of legislative history providing such evidence; and (3) the long and continuous executive branch practice of proceeding as though legislative veto provisions are invalid and treating them as requiring only that the designated committees "be consulted." *Id.* at 521–23.

---

[2] We also note that the absence of a severability clause in the subject legislation, which is the case here, does not give rise to a presumption against severability. *Alaska Airlines*, 480 U.S. at 686.

In a 1991 opinion, we similarly concluded that an unconstitutional legislative veto clause was severable from the measure's primary provision for accelerated procurement of certain military supplies. *Severability of Legislative Veto Provision*, 15 Op. O.L.C. 49 (1991). There, we focused on the nature of the primary substantive provision to which a legislative veto or similar legislative control mechanism is attached. Quoting the Supreme Court's *Alaska Airlines* opinion, 480 U.S. at 685, we considered whether the primary provision is "so controversial or so broad" that Congress would have been unwilling to enact it "without a strong oversight mechanism." 15 Op. O.L.C. at 51. Where that is *not* the case, and where the function of the legislative control mechanism is subordinate and expendable in relation to the primary enactment, severability is warranted.

Measured against the foregoing standards, the unconstitutional committee approval clause appears properly severable from the remainder of section 726. Although the text of the section is awkwardly worded, its primary prohibition against the use of FY 1996 funds to implement the regulation is not made dependent or conditional upon the committee approval provision that follows it. The committee approval mechanism is one of two alternative preconditions to the regulation "tak[ing] effect" at a later time, but there is no indication that the primary spending restriction was intended to be subordinate to the availability of those mechanisms. Moreover, it is evident from the text that the spending restriction clause is capable of functioning independently and workably — i.e., it would be "fully operative as a law" within the meaning of *Alaska Airlines*, 480 U.S. at 684 — when separated from the unconstitutional committee approval clause. Thus, the text of section 726 strongly supports a conclusion that the committee approval provision is severable.

The legislative history of the Act, moreover, does not support the view that Congress would have declined to enact the untainted portions of section 726 in the absence of the tainted committee approval mechanism. Section 726 originated as part of the Senate version of the agricultural appropriations legislation. The section was discussed at some length during a Senate floor debate on a motion to strike the provision from the bill. 141 Cong. Rec. 25,569–84; 25,619–21 (1995). That debate concentrated on the substantive merits of the fresh poultry regulation, rather than on the precise legal effect of section 726. Although the debate contained some statements touching on the measure's purpose and effect, it provides only limited evidence of the Senate's understanding and intent.

Opponents of section 726 insisted that it was intended to stop the USDA regulation from going into effect altogether.[3] Proponents of section 726 offered a variety of perspectives. Responding to charges that the section would inappropriately enact substantive legislation through an appropriations bill, the bill's floor manager, Senator Cochran, stated, "I am not advocating legislation on this bill. *I am*

---

[3] 141 Cong. Rec. at 25,570–72 (remarks of Sens. Boxer and Feinstein); *id.* at 25,620 ("The committee amendment[s] would stop that rule from going into effect.") (remarks of Sen. Boxer).

*saying no funds shall be used to carry out this regulation.''* 141 Cong. Rec. at 25,571 (emphasis added) (statement of Cong. Cochran). Statements by other proponents of section 726 generally reflected an intent to reject the pending poultry regulation, while allowing for the proposal of a different one to be considered by the agricultural committees or by the Congress.[4]

Additional specific commentary on section 726's intended effect is found in the Senate debate on the conference report on H.R. 1976, the bill that was enacted. Just before final passage, a colloquy took place between Senator Cochran, the Chairman of the Appropriations Committee's Subcommittee on Agriculture, and Senator Bumpers, the Ranking Minority Member of that subcommittee. These senators were the respective floor managers for the legislation, and Senator Cochran was the sponsor of the amendment that added section 726 to the bill.[5] Referring to the conference committee's actions on the fresh poultry regulation provision, Senator Bumpers stated:

> I understand that, by including the Senate-passed bill provision in the conference report, the conferees intended to prevent the final rule which was promulgated on August 25, 1995, from taking effect, and also to prevent USDA from using any funds to implement or enforce this regulation as promulgated. Is that my colleague's understanding as well?

141 Cong. Rec. at 27,744. Senator Cochran responded in relevant part as follows:

> [T]his is my understanding of the effect of the conference committee's action as well. As you may recall, the regulation as promulgated did not reflect the Department's findings in scientific research. . . . Therefore, the language of this act makes it clear that the rule as published on August 25 shall never go into effect unless the conditions of this statutory language is [sic] met. The burden is now upon USDA to submit a regulation to the appropriate committees for approval which resolves these critical issues in a satisfactory manner.

---

[4] 141 Cong. Rec. at 25,573–82 (remarks of Sens. Lott, Warner, Cochran, Faircloth, Pryor, Bumpers, Helms, Heflin, and Biden). For example, Senator Lott stated, "The purpose of the provision is to require that the Secretary of Agriculture develop and implement a more reasonable regulation." *Id.* at 25,573. Senator Faircloth said the measure "requir[es] the Department of Agriculture to report back to Congress with a new rule regarding poultry labeling." *Id.* at 25,575. Senator Helms said the issue presented by the measure was "whether the Senate should allow the USDA to proceed with such unnecessary requirements." *Id.* at 25,580.

[5] As such, his remarks can be viewed as "an authoritative guide to the statute's construction." *North Haven Board of Educ. v. Bell*, 456 U.S. 512, 527 (1982).

*Id.*[6]

The limited House debate touching on section 726 also occurred during consideration of the final conference committee report (141 Cong. Rec. at 27,796–812). This arose in the context of a motion to recommit the overall bill for removal of section 726. The House debate was almost exclusively devoted to the merits of the frozen poultry regulation and did not address the relative significance of the different components of section 726.

Considering the text of section 726 against the overall legislative history, it is evident that Congress was strongly committed to barring the use of FY 1996 appropriations to implement the regulation and that this was the primary and predominant purpose underlying that section. The subsequent provision for the submission of a substitute regulation to the agricultural committees for their approval reflected a secondary and subordinate intent to allow USDA an opportunity to issue a revised regulation, but only if it could be done on terms satisfactory to Congress as a whole or the respective agricultural committees. Moreover, we find no persuasive evidence that Congress intended the measure's spending restriction to be conditional or dependent upon the enforceability of the subordinate provision for a committee-approved substitute regulation. Thus, the provision's legislative history tends to reinforce our conclusion that section 726's valid spending restriction is severable from the unconstitutional committee approval provision.

We also believe that the clause providing that the regulation may take effect "only if legislation is enacted into law" directing the Secretary to promulgate such a regulation — i.e., the first of the two alternative prerequisites for putting the regulation into effect — is severable from the committee approval provision. Our conclusion on that point is governed by the same considerations discussed above and mirrors the calibrated method of severance employed by the Supreme Court in *Chadha*. There, the Court struck only the unconstitutional one-House veto provision, while letting stand an accompanying report-and-wait clause. *Chadha*, 462 U.S. at 935 & n.9.

Here, striking only the unconstitutional committee approval clause leaves standing the bar against use of appropriations to implement the regulation, together with a separate proviso that the regulation may "take effect" through the enactment of authorizing legislation. Such a "remainder" of the section is intelligible, consistent with the main thrust of congressional intent, and would not result in a provision that fundamentally alters the measure that was actually enacted. Although it might be argued that the two remaining provisions would be somewhat redundant, the fact remains that each produces a result that the other does not. While the spending restriction would *bar* the use of FY 1996 appropriations to implement the regulation both before and after its scheduled effective date of August 26, 1996, the "take effect" proviso would *authorize* the use of appropriated

---

[6] To the extent that this statement asserts that section 726 was intended to establish a permanent bar against the regulation's taking effect, it would be inconsistent with Senator Cochran's earlier remarks in the pre-Conference Senate debate. There, he stressed that he was "not advocating legislation on this bill." 141 Cong. Rec. at 25,571.

funds if legislation is enacted that directs the Secretary to promulgate the regulation.

## 3. *Permanent or Temporary Legislation*

You have also inquired whether section 726 should be regarded as permanent or temporary legislation. As explained above, we regard both the bar against the use of FY 1996 appropriations and the provision that the poultry regulation can be put into effect only through enactment of legislation as severable and sustainable provisions of that section. It is self-evident that the restriction on the use of FY 1996 appropriations is temporary legislation and does not govern the use of future appropriations. In unequivocal terms, that provision affects only the use of "funds appropriated or otherwise made available by *this Act*." 109 Stat. at 332 (emphasis added). The more difficult question is whether the provision that the regulation may not "take effect" without the enactment of authorizing legislation expires with the end of FY 1996, or continues beyond that date.

Although the enactment of permanent, substantive legislation through appropriations acts is generally disfavored, *see TVA v. Hill*, 437 U.S. 153, 190 (1978), it is recognized that Congress may constitutionally do so. *United States v. Will*, 449 U.S. 200, 221–22 (1980); *United States v. Dickerson*, 310 U.S. 554 (1940). As the Supreme Court has stated, the " 'whole question' " of whether a given appropriations rider validly enacts permanent legislation " 'depends on the intention of Congress as expressed in the statutes.' " *Will*, 449 U.S. at 222 (quoting *United States v. Mitchell*, 109 U.S. 146, 150 (1883)).

In *Building & Constr. Trades Dep't, AFL–CIO v. Martin*, 961 F.2d 269 (D.C. Cir.), *cert. denied*, 506 U.S. 915 (1992) (*"BCTD v. Martin"*), the Court of Appeals for the D.C. Circuit addressed that question with reference to another appropriations act rider restricting the implementation of identified agency regulations. The provision in question there provided:

> Notwithstanding any other provision of law, no funds shall be expended by the Secretary of Labor to implement or administer [various regulations based upon the Davis-Bacon Act] . . . or to implement or administer any other regulation that would have the same or similar effect.

Dire Emergency Supplemental Appropriations for Consequences of Operation Desert Shield/Desert Storm, Food Stamps, Unemployment Compensation Administration, Veterans Compensation and Pensions, and Other Urgent Needs Act of 1991, Pub. L. No. 102–27, § 303, 105 Stat. 130, 151. In holding that this section could not be construed as permanent legislation, the court explained the basic governing principles:

While appropriation acts are "Acts of Congress" which can substantively change existing law, there is a very strong presumption that they do not, and that when they do, the change is only intended for one fiscal year. In fact, a federal appropriations act applies only for the fiscal year in which it is passed, unless it expressly provides otherwise. Accordingly, a provision contained in an appropriations bill operates only in the applicable fiscal year, unless its language clearly indicates that it is intended to be permanent.

*BCTD v. Martin*, 961 F.2d at 273–74 (citations omitted).

The court further explained that such an intent is principally established through "words of futurity or permanency," such as the phrase, "'to apply in all years hereafter.'" *Id.* at 274. Finding that "nothing in the rider affects the ability of the Secretary to promulgate the present regulations at any time other than during the 1991 fiscal year," the court concluded that it was not permanent legislation. *Id.*

Given the principles reflected in opinions such as *BCTD v. Martin* and *Minis v. United States*, 40 U.S. (15 Pet.) 423, 445 (1841), clear and convincing evidence of congressional intent is needed to establish that a provision in an appropriations act constitutes permanent legislation. Based on the text and legislative record presented here, we conclude that this exacting standard has not been satisfied and that the congressional approval prerequisite is effective only during fiscal year 1996.

First, the text of section 726 does not unambiguously express an intent to enact permanent legislation unrelated to annual appropriations. Rather, the "take effect" restrictions are expressed in a "proviso" linked to a restriction on the use of FY 1996 appropriations. Matter expressed in the form of a proviso in an appropriations bill is generally restricted to the fiscal year covered by the bill. *See Minis*, 40 U.S. at 445–46; *Permanent Legislation in an Appropriation Act—Gwinn Amendment Involving Public Housing*, 41 Op. Att'y Gen. 274, 277–78 (1956). Although the proviso in section 726 does not impose a precondition on the spending restriction that precedes it, and although the intended scope of the proviso is not entirely clear, the use of this format nonetheless suggests that the "take effect" limitation is tied to the restriction on use of the appropriation.

Second, section 726 does not contain the terms of "futurity" (such as "hereafter") that are given crucial significance in determining whether an appropriations rider creates permanent legislation. *See BCTD v. Martin*, 961 F.2d at 273–74. Although we do not consider the absence of such terms dispositive, it is persuasive in combination with the other factors presented here.

Finally, the pertinent legislative history is inconsistent in key respects and ultimately inconclusive on the permanence issue. We acknowledge that the previously-quoted colloquy between Senators Cochran and Bumpers preceding the Senate vote on the conference report might be cited as strong evidence that the

section 726 proviso was intended as a permanent bar to the regulation's taking effect in the absence of approving legislation. *See* 141 Cong. Rec. at 27,744. Although that colloquy provides significant legislative history, its force is substantially undercut by Senator Cochran's earlier statement during the Senate debate, when he pointedly denied that he intended to enact substantive legislation on the agricultural appropriations bill. *Id.* at 25,571.[7] Moreover, inasmuch as the Cochran-Bumpers colloquy was undertaken after the House had taken its final vote on the conference report, and no similar expressions were made in the House, we cannot readily conclude that it reflected the will or understanding of the House. Especially in light of section 726's confusing textual formulation, we do not find the legislative history sufficiently clear and consistent to satisfy the strict standards for establishing the permanence of an appropriations proviso.[8]

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[7] This disclaimer was significant, because an acknowledgment that a permanent provision was intended would have invited a point of order based on charges that section 726 violated Senate Rule XVI, which prohibits the inclusion of permanent legislation in appropriations bills reported by the Appropriations Committee, as well as in floor amendments to appropriations bills.

[8] We have also considered the contention that an appropriations act provision may be construed as permanent "if construing it as temporary would render the provision meaningless or produce an absurd result." 1 GAO, *Principles of Federal Appropriations Law* 2–32 (2d ed. 1991). Here, the USDA regulation is not scheduled to take effect until August 26, 1996. Because fiscal year 1996 expires on October 1, 1996, the "take effect" proviso would come into play for only 36 days if it operates only during FY96. Thus, it might be argued that Congress would not have enacted the proviso to achieve such an inconsequential effect and it follows that a permanent effect was intended. We do not find that argument conclusive for a number of reasons. First, we believe the "take effect" proviso does add a meaningful component above and beyond the spending prohibition. Section 726 was enacted nearly a full year before the expiration of the fiscal year. At any time during that period, Congress could enact a law directing the Secretary to promulgate the regulation, thereby making funds available to implement the regulation without requiring a separate appropriation. Second, the Comptroller General opinions applying this principle have been generally limited to situations where the measure in question would be rendered effective for *extremely* brief periods (e.g., one day) if its effect were limited to the fiscal year covered by the appropriations bill in question. *See id.* at 2–32. That is not the case here. Finally, if the "take effect" proviso is read broadly to foreclose enforcement of the regulation until Congress says otherwise, then the *appropriations limitation* becomes, if not meaningless, of little real effect. In short, section 726 is subject to this sort of attack however it is read.