# Trade Act Restrictions on the Extension
## of Most-Favored-Nation Rights

A trade agreement negotiated with Canada to be implemented pursuant to the "fast track" authority provided by the Trade Act of 1974, as amended, is subject to § 102(b)(3) of the 1974 Act, 19 U.S.C. § 2112(b)(3). That section prohibits the extension to other countries of any trade benefits received by a country under a "fast track" agreement if such agreement provides for a reduction or elimination of any duty imposed by the United States. As a matter of domestic law, this prohibition was intended to, and does, impair the automatic operation of most-favored-nation clauses in various treaties to which the United States is a party. The impairment caused by § 2112(b)(3) can be reduced in this instance by simultaneously concluding an agreement with Canada addressing non-duty benefits and a separate agreement addressing duty reductions. Section 2112(b)(3) would prevent only the benefits given to Canada under the latter agreement from being extended to third countries enjoying applicable most-favored-nation rights. Furthermore, any legislation implementing the trade agreement with Canada would not operate to repeal the operation of § 2112(b)(3) in this case unless Congress expressly provided to that effect in the legislation. Finally, the United States' international obligations with respect to most-favored-nation agreements have force even if such agreements were concluded after enactment of § 2112(b)(3).

August 31, 1987

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

## I. Introduction

This memorandum responds to your request for our views on certain legal issues that may arise upon the conclusion of a U.S./Canadian trade agreement (Agreement) which the Administration is presently negotiating in the expectation of submitting it to Congress for implementation under special "fast track" authority provided by the Trade Act of 1974, as amended. Specifically, your Office has asked whether § 102(b)(3) of the Trade Act, 19 U.S.C. § 2112(b)(3), which applies to agreements negotiated under "fast track" authority, restricts as a matter of domestic law the extension of trade benefits received by Canada under the Agreement to other foreign nations which have most favored nation rights (MFNs) under Friendship, Commerce, and Navigation, Treaties (FCNs) or other bilateral agreements.[1] By operation of applicable MFN clauses in

---

[1] The President, of course, has independent authority to negotiate free trade agreements as an aspect of his plenary power to conduct foreign affairs. See generally, United States v. Curtiss-Wright Export Corp., 299 U.S. 319 (1936). This independent authority may not be restricted in any way Accordingly, the President may conclude the Agreement under his own independent authority and avoid entirely the restrictions imposed by § 2112. Congress may, however, agree, as it has under § 2112, to consider legislation implementing an agreement on an expedited basis only on the condition that the President comply with certain requirements that are otherwise constitutional.

128

such agreements the United States may be obligated under international law to extend benefits received by Canada under the Agreement to certain third countries. If § 2112(b)(3) frustrates the operation of any such MFN clauses, you have asked whether legislation implementing the Agreement could be deemed to repeal these restrictions insofar as they affect the Agreement. Finally, you have asked whether MFN clauses in agreements which were concluded *after* the enactment of § 2112(b)(3) into our domestic law require the extension of trade benefits included in agreements negotiated under § 2112(b)(3). We have concluded that 19 U.S.C. § 2112(b)(3) does prohibit the automatic extension to third countries of trade benefits received by Canada under the Agreement, but only if the Agreement provides for the elimination or reduction of any duty imposed by the United States. In other words, if the Agreement were to provide Canada solely with benefits other than tariff or duty reductions, the United States would be at liberty to comply with any international obligation that requires it to extend to a third country by operation of treaty the trade benefits Canada received.[2] On the other hand, if the Agreement eliminated or reduced a United States duty, the United States would not be able to comply with applicable MFN clauses by automatically extending to third countries benefits granted to Canada. Moreover, we believe that if the Agreement were to reduce United States duties, § 2112(b)(3) would frustrate the automatic extension of any benefits, regardless of whether the trade benefit to be extended is itself a reduction of a duty or a benefit unrelated to duty reduction.

Second, we have concluded that the legislation implementing the Agreement cannot be viewed as an implicit repeal of § 2112(b)(3)'s prohibition on the automatic extension to third countries of benefits provided to Canada under the Agreement. Accordingly, in order to permit the extension of these benefits to third countries Congress must explicitly provide for the extension.

Finally, we believe that the international obligations of the United States under treaties concluded after enactment of § 2112(b)(3) into domestic law are not modified by § 2112(b)(3)'s prohibition on the automatic extension of MFN rights, unless the text of the treaty or its negotiating history indicates that the foreign signatory agreed that trade benefits included in agreements negotiated under § 2112(b)(3) did not have to be extended under applicable MFN clauses.

## II. Analysis

### A. *Most Favored Nation Rights under Existing Treaties*

Certain Friendship, Commerce and Navigation Treaties or other bilateral treaties entered into by the United States which accord most favored nation

---

[2] Consequently, in order to reduce the number of international obligations that § 2112(b)(3)'s prohibition may cause to be impaired, the United States may wish to conclude one agreement with Canada addressing non-duty trade benefits and a separate agreement addressing duty reductions. Only benefits granted under the latter agreement would be subject to § 2112(b)(3).

rights to foreign countries require the United States to extend to such countries the benefits Canada might receive under a U.S./Canadian trade agreement. Although we have not had the opportunity to consider closely each individual treaty currently in force which grants MFNs to foreign countries and have had to rely on the views of the State Department concerning the scope of such treaties,[3] we have nevertheless reviewed a representative sample of FCNs which grant unconditional MFN rights and concur in the State Department's judgment that certain treaties would, by their terms,[4] obligate the United States to grant their signatories the same trade benefits the United States might accord to Canada. Therefore, assuming that at least some treaties would impose this obligation under international law, and that some United States treaty partners could request equal treatment, our principal focus here has been to determine to what extent Congress under domestic law has precluded United States compliance with these international obligations.[5]

## B. Trade Act of 1974

Under 19 U.S.C. § 2112 (§ 102 of the Trade Act), Congress has provided the President with authority to receive special consideration of free trade agreements he negotiates, but has circumscribed this authority through a variety of restrictions. If the President uses this authority to negotiate an agreement, legislation implementing the agreement will be put on a "fast track" and

---

[3] *See* State Department Memorandum, "Impact on U.S. Friendship, Commerce and Navigation Treaties." The State Department is of the view that the scope of some treaties granting MFN rights by their terms would not grant a foreign state all the benefits of a trade agreement with Canada. *See* State Department Memorandum at 1–2. For example, the standard FCN treaty provides an exception for "goods" if the agreement relating to goods is permitted by the General Agreement on Tariffs and Trade and if the FCN treaty partner consults with the other. *Id.* at 1. In the few treaties where such exception is not made (those with Saudi Arabia, Yemen, Liberia, Iraq, El Salvador, Honduras, Costa Rica and Bolivia) trade with the signatories is said to be small. *Id.* More complicated is the situation for services and investment. Both our FCN treaties with major trading partners (*e.g.* Germany, Japan, Italy, Netherlands, Israel and Korea) and Bilateral Investment Treaties (which have been signed with ten countries, but not yet ratified) evidently accord fairly unconditional MFN rights. *Id.* at 3–4. In addition, the United States has entered into various Organization for Economic Co-Operation and Development "Undertakings With Regard to Capital Movements" and "Undertakings With Regard to Current Invisible Operations" which also are said to grant broad MFN obligations in services and investment. *Id.* at 4.

[4] The State Department Memorandum states:

> [T]he standard FCN imposes a sweeping MFN obligation with respect to the right of alien nationals or companies to:
>
> (a) establish and maintain branches, agencies, offices, factories and other establishments appropriate to the conduct of their business;
>
> (b) organize companies under the general company laws of such other Party, and to acquire majority interests in the companies of such other Party;
>
> (c) control and manage enterprises which they have established or acquired; and
>
> (d) engage in all types of commercial, industrial, financial and other activity for gain (services) within the territory of each Party.

*Id.* at 2–3. Moreover, the standard FCN provides that "'nationals and companies of either party . . . shall in any event be accorded most-favored-nation treatment with reference to the matters treated in the present Article.'" *Id.*

[5] Congress can, of course, by statute override and nullify the domestic effect of any treaty obligations the United States might have. *See generally Whitney* v. *Robertson,* 124 U.S. 190 (1888).

receive expedited consideration for congressional approval. *See generally* 19 U.S.C. § 2191.[6] This grant of authority includes both the power to conclude bilateral agreements which do not result in the reduction of duties or tariffs and the authority to conclude bilateral agreements making reductions in duties. Section 2112, however, imposes a variety of additional requirements when the President is engaged in the negotiation of an agreement that reduces duties.[7]

Moreover, Congress has prohibited any trade benefit included in a treaty that reduces a duty of the United States from being extended to third countries simply by operation of MFN clauses in a treaty between the United States and the third country. Section 2112(b)(3) provides:

> Notwithstanding any other provision of law, no trade benefit shall be extended to any country by reason of the extension of

---

[6] Under the fast track authority, the President negotiates the trade agreements and notifies Congress ninety days before they are to take effect of his intention to enter into the agreements. After consultation with certain congressional committees, the trade agreements may be signed and together with a draft implementing bill and a statement of proposed administrative actions are submitted to Congress. Once in Congress, the bill is entitled to expedited consideration. For example, the bill can be automatically discharged from committee evaluation to allow consideration by the full House or Senate after 45 days. No amendments may be attached to the bill, and there is imposed a time limit on debate in both the House and Senate. The proposed legislation must be acted upon by Congress within approximately sixty legislative days. 19 U.S.C. §§ 2112, 2191 (1982).

It should be noted that the present statutory scheme denies the "fast track" option to the President if "the Committee on Finance of the Senate or the Committee on Ways and Means of the House of Representatives disapproved of the negotiation of such agreement." 19 U.S.C. § 2112(b)(4)(B)(ii)(II). This provision is unconstitutional. Congressional committees may not exercise legislative power by making decisions that have "the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative Branch." *INS* v. *Chadha*, 462 U.S. 919, 952 (1983).

We believe, however, a strong argument can be made that § 2111(b)(4)(B)(ii)(II) is severable under the reasoning of *Alaska Airlines* v. *Brock*, 480 U.S. 678 (1987). The general rule concerning severability is that "unless it is evident that the Legislature would not have enacted those provisions which are within its powers, independently of that which is not, the invalid part may be dropped if what is left is fully operative as law." *Buckley* v. *Valeo*, 424 U.S. 1, 108 (1976) (per curiam) (quoting *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma*, 286 U.S. 210–234 (1932)). In *Alaska Airlines*, the Court applied this general rule to hold that an unconstitutional legislative veto provision was severable from the Airlines Deregulation Act of 1978. 480 U.S. at 684–97. The Court reasoned that Congress would have enacted the statute even without the objectionable provision. *Id.* at 697.

It appears to us that the "fast track" authority like the legislative veto considered in *Alaska Airlines*, is not so controversial that Congress would have been unwilling to make the delegation without it. Moreover, the detailed requirements imposed on the President in other parts of the statute, *see, e.g.* 19 U.S.C. § 2112(b)(4)(A), suggest that the legislative veto provision is not crucial. 480 U.S. at 688 (detailed requirements imposed on Executive Branch indicated that veto provision could affect only relatively insignificant actions by Secretary of Transportation). Finally, nothing in the legislative history of § 2112 suggests that Congress was particularly concerned about the Congressional disapproval mechanism. *See* 480 U.S. at 691 (Congress' scant attention to legislative veto suggests that Act would have been passed in its absence). Thus, it is our view that a court would find § 2112(b)(4)(B)(ii)(II) severable.

[7] These procedures are described in 19 U.S.C. § 2112(b)(4)(A):

> Notwithstanding paragraph (2) [limiting authority to negotiate a tariff reduction agreement with Israel], a trade agreement that provides for the elimination or reduction of any duty imposed by the United States may be entered into under paragraph (1) with any country other than Israel if —
>> (i) such country requested the negotiation of such an agreement, and
>> (ii) the President, at least 60 days prior to the date notice is provided under subsection (e) (1) of this section —
>> (I) provides written notice of such negotiations to the Committee on Finance of the Senate and the Committee on Ways and Means of the House of Representatives, and
>> (II) consults with such committees regarding the negotiations of such agreement.

> any trade benefit to another country under a *trade agreement entered into under paragraph (1) with such other country that provides for the elimination or reduction of any duty imposed by the United States.*

19 U.S.C. § 2112(b)(3) (emphasis added.) Congress appears to have intended that this section frustrate the automatic operation of MFN clauses in FCN treaties. *See* H.R. Rep. No. 1092, 98th Cong., 1st Sess. 16 (1984) (subsection precludes any possibility, as a matter of domestic law, of extension through court decision or executive action of trade benefits to other countries pursuant to any existing treaties or executive agreements without further congressional approval).

It is also clear that Congress intended § 2112(b)(3), as presently formulated, to apply *only* to trade agreements that reduce United States duties, because prior to a technical correction made in 1985 to the Trade Act, § 2112(b)(3) applied to all trade agreements negotiated under the "fast track" authority.[8] The change made in 1985 purposely limits the scope of § 2112(b)(3) to a trade agreement negotiated under the authority of the Trade Act "that provides for the elimination or reduction of any duty imposed by the United States." Pub. L. No. 99–47, 99 Stat. 82 (1985).[9]

Accordingly, we are of the opinion that under § 2112 trade benefits that Canada may receive under an agreement that does not reduce United States duties can be extended to countries with appropriate MFN clauses under FCN treaties by operation of those treaties and without additional congressional approval. We also believe that in order to reduce the number of international obligations which the § 2112(b)(3)'s prohibition may cause to be impaired the United States may simultaneously conclude an agreement with Canada addressing non-duty trade benefits and a separate agreement addressing duty reductions.[10] Section 2112(b)(3) would prevent only the benefits given to

---

[8] Section 2112(b)(3) then provided:

> Notwithstanding any other provision of law, no trade benefit shall be extended to any country by reason of the extension of any trade benefit to another country under a trade agreement entered into under paragraph (1) with such other country.

[9] The House Ways and Means Committee report concerning the technical correction makes the purpose of the change clear beyond doubt:

> Section 8 [of H.R. 2268, a bill to implement the free trade agreement with the United States and Israel] makes five technical corrections to the Trade and Tariff Act of 1984 and to the Trade Act of 1974 related to the authorization and administration of the [U.S./Israel] Agreement.
>
>       \*      \*      \*
>
> Paragraph (1) of subsection (b) amends section [2112(b)] of the Trade Act of 1974 as added by section [2112(b)(3)] of the Trade and Tariff Act of 1984, to clarify that the prohibition on extension of any trade benefit under a trade agreement being extended to any other country applies to trade agreements providing for the elimination or reduction of any U.S. duty, as opposed to agreements on nontariff barriers.

H.R. Rep. No. 64, 99th Cong., 1st Sess. 18–19 (1985). *See also* S. Rep. No. 55, 99th Cong., 1st Sess. 10 (1985).

[10] Of course, insofar as the non-duty and duty agreements were related to one another (*e.g.* through provisions which treat a breach of one agreement as equivalent to the breach of the other), it would be more difficult to argue that the agreements were separate. As long as the agreements, however, are not textually integrated and are submitted to Congress for separate consideration and implementation, we believe that the agreements are to be considered as separate for the purposes of § 2112(b)(3).

Canada under the latter agreement from being extended to third countries under applicable MFN clauses.

On the other hand, § 2112(b)(3) by its express terms prohibits trade benefits that Canada receives under an agreement reducing United States duties from being extended by operation of treaty to those who hold MFN rights under FCN treaties or other agreements. Moreover, we have concluded that the term "trade benefits" encompasses both benefits in the form of duty reductions and trade benefits that are unrelated to duty reductions. First, § 2112(b)(3) uses the term "duty" as well as "trade benefit." It is an axiom of statutory construction that different terms, particularly technical terms, in a statute are to be given different meanings unless the context indicates otherwise. *See e.g.*, *Ocasio* v. *Bureau of Crimes Correction Division of Workers Compensation*, 408 So. 2d 751, 753 (Fla. Dist. Ct. App. 1982). Moreover, it is clear from the conference report on the 1984 amendments to the Trade Act that Congress enacted § 2112(b)(3) to prevent certain U.S. treaties from being interpreted "to extend automatically to [an]other party, by virtue of most-favored-nation provisions, any tariff or *other trade benefit.*" H.R. Rep. 1156, 98th Cong., 1st Sess. at 152 (emphasis added).[11]

You have also asked whether future legislation implementing a U.S./Canadian trade agreement could be viewed as repealing, *pro tanto*, § 2112(b)(3)'s prohibition on the extension of MFN benefits by the operation of treaty on the ground that the implementing legislation was enacted by Congress subsequent to § 2112(b)(3). In the absence of explicit language repealing the § 2112(b)(3)'s prohibition, we believe that the mere passage of implementing legislation would leave the prohibition intact. Section 2112(b)(3) specifically contemplates that the limitation on extending MFN rights would apply despite the conclusion of a treaty that reduced United States duties unless Congress specifically approved the extension.[12] Accordingly, it is not possible to view legislation implementing a U.S./Canadian tariff reduction trade agreement as *pro tanto* repealing § 2112(b)(3)'s limitation.

The final question you have asked concerns the status of any bilateral trade agreements containing MFN rights entered into after enactment of § 2112(b)(3) in 1984. You have asked whether the fact that § 2112(b)(3) existed at the time such an agreement was concluded would be deemed to release the United States from obligations under the agreement that are inconsistent with that provision. We believe that the United States could not successfully argue that the existence of § 2112(b)(3) under its domestic law modified its obligation under an agreement concluded after its enactment unless the text of the agreement or its negotiating history demonstrate that the foreign signatory agreed that the obligation should be so modified. It is a fundamental principle of the

---

[11] There is no doubt that the words "trade benefit" include benefits related to both goods and services because the term "international trade" is defined in the statute as including:

    (A) trade in both goods and services and

    (B) foreign direct investment by the United States persons, especially if such investment has implications for trade in goods and services.

19 U.S.C. § 2111(g).

[12] *See* H.R. Rep. No. 1092, 98th Cong., 1st Sess., at 16.

interpretation of international agreements that, with exceptions not relevant here, "a party may not invoke the provisions of its internal law as a justification for its failure to perform a treaty." Article 27 of the Vienna Convention on the Law of Treaties, U.N. Doc. A/Conf. 39/27, May 23, 1969 (Vienna Convention) (signed by the United States April 24, 1970 and awaiting ratification by the Senate).[13] A contrary rule would make it extremely difficult, if not impossible, for one nation to ascertain the treaty obligations that another undertakes.[14]

JOHN O. MCGINNIS
*Acting Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[13] Although we have not yet ratified the Convention on the Law of Treaties, we believe that the Convention generally reflects the international customary law which would be applied to international agreements.
Further support for our view may be found in Article 46 of the Vienna Convention:

> 1. A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.
> 2. A violation is manifest if it would be objectively evident to any State conducting itself in the matter in accordance with normal practice and in good faith.

We do not believe that § 2112 would be considered an "internal law of fundamental importance," as this term is reserved for provisions of constitutional law.

[14] *See* Browline, *Principles of Public International Law* 610–11 (3d ed. 1979).