Cecil Alfred ROBINSON, Jr., Plaintiff,

v.

AMERICAN AIRLINES, INC.,
Defendant.

Civ. A. No. 86–1674.

United States District Court,
District of Columbia.

May 31, 1989.

Robert W. Beckman, Washington, D.C.,
for plaintiff.

Gregory S. Lewis, Morgan, Lewis & Bockius, Washington, D.C., for defendant.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Congress, as part of the Employee Protection Program of the Airline Deregulation Act of 1978 ("ADA"), has imposed on covered air carriers an affirmative "duty to hire" dislocated employees, "regardless of age." Pub.L. No. 95–504, § 43(d), 92 Stat. 1751 (codified at 49 U.S.C.App. § 1552(d) (1982)). Congress thus recognized that "[o]lder employees looking for a new job might encounter difficulties because of their age," and its policy was to insure that the benefits of the deregulation "are not paid for by a minority—the airline employees and their families who have relied on the present system." S.Rep. No. 631, 95th Cong., 2d Sess. 114 (1978). At the same time, Congress expressed a policy that the implementation of the Act "result in no diminution of the high standard of safety in air transportation...." 49 U.S.C.App. § 1307(a). The present case reflects the potential tension between these congressional policies.

Plaintiff, Cecil Alfred Robinson, Jr., is a protected employee under the ADA who claims that American Airlines, Inc. ("American") denied him his first right of hire by rejecting him as a pilot applicant in 1985, when he was 45. American claims in response that plaintiff was not qualified. American, however, has been a victim of its own litigation posturing since the inception of this case—although American was perhaps spurred to overreaction by Mr. Robinson's early threats of litigation. In any event, the Court was compelled to reject American's motion for summary judgment and reopen discovery when American offered materially inconsistent justifications for its failure to hire plaintiff. *Robinson v. American Airlines*, No. 86–1674, 1987 WL 49708 (D.D.C., Nov. 17, 1987). In particular, American's pleadings raised the question whether its blood pressure and weight requirements—which plaintiff failed—were in fact bona fide safety-based medical qualifications. *Id.*, slip op. at 5–6.

The case was tried to the Court to resolve that question. American's evidence has thus now been subjected to the crucible of trial, and the credibility of its final version of why it rejected plaintiff has been tested by cross examination. The Court shall, therefore, draw no further inferences from American's pretrial vacillations. And, on the basis of the evidence submitted at trial, the Court shall enter judgment for American.

## I. FINDINGS OF FACT

Mr. Robinson was a former commercial airline pilot with Capitol International Airways, Inc. He flew for that airline from March 1968 to November 1984, when the airline declared bankruptcy and he was permanently furloughed. During his tenure with the airline he had logged over 10,500 hours of flight time and achieved the rank of First Officer. It is stipulated that because of losing his job with Capitol he qualifies as a "protected employee" under the ADA.

After he was permanently furloughed, he unsuccessfully applied for employment with several airlines.[1] Then on July 26, 1985, he received a telegram from the Future Aviation Professionals of America ("FAPA"), a private job search organization unaffiliated with American, regarding a potential position with American. *See* Joint Exhibit ("JE") 3. FAPA had been informed by Judy Tarver, Manager of Pilot Recruitment at American, that American was seeking to hire new crewmembers.

The FAPA telegram listed, in abbreviated fashion, the requirements for the position: possession of a commercial license with instrument rating; possession of a Federal Aviation Administration ("FAA") First Class Medical Certificate; having vision corrected to 20/20; be a high school

1. In fact, he applied to at least 36 carriers, most of which never even acknowledged his application. Besides American, only United Air Lines invited Mr. Robinson for an interview, but did not make him an offer. One could thus question how effective the Employee Protection Program has been.

graduate; and Flight Engineer written certificates preferred. *Id.* It also stated that flight experience would be "reviewed on a competitive bases[sic]." *Id.* The telegram instructed him not to write or call American and that American would be mailing him an application form if he had not previously applied.

He heard nothing further from American and on August 28, 1985, he sent American by certified mail, return receipt requested, the following letter:

Gentlemen:

After 16 years of employment with Capitol Air, I was working as a DC 8 first officer when the company ceased operations and filed for bankruptcy in November due to the pressures of airline deregulation. I would therefore like to request the right of first hire under the employee protective provisions of section 43 of the Airline Deregulation Act in the event that American should hire any flight crewmembers.

It has long been my dream to work for American Airlines. Can you offer me any hope of fulfilling that dream?

My resume is enclosed. I appreciate your consideration of my request.

JE 4. The return receipt indicates American received this letter on August 30, 1985.

Before receiving Mr. Robinson's letter, American had sent him blank application forms, which he in turn received on August 30, 1985. Part of this material was a form entitled "Pilot Applicant Basic Qualifications" which listed American's "basic" hiring qualifications as follows:

| | |
|---|---|
| AGE: | Minimum 21 |
| HEIGHT: | 65" TO 77" |
| WEIGHT: | In proportion to height |
| VISUAL ACUITY: | Corrected to 20/20 |
| EDUCATION: | College degree or its equivalent |
| CITIZENSHIP: | U.S. citizen or appropriate documents; however, the applicant |

| | |
|---|---|
| | must be able to read, write, fluently speak and understand the English language. |
| CERTIFICATES, RATINGS & PERMITS | FAA Commercial License with an instrument rating, no limitations. |
| | OR |
| | Current Air Transport Pilot Rating. |
| | Flight Engineer Basic & Turbojet or FEX written examinations passed within the past 24 months. |
| | OR |
| | Valid Turbojet Flight Engineer Certificate. |
| | Valid FCC Restricted Radio Telephone Operator Permit. |
| | Valid First Class FAA Medical Certificate (explain restrictions). |
| FLYING TIME: | Commensurate with other qualifications. |

JE 8.

Meanwhile, Mr. Robinson's August 28th letter was discarded by the Pilot Recruitment Department at American in accordance with its practice of opening a formal file on an applicant only upon receiving a complete application and not upon receiving a request for application materials. Mr. Robinson thereafter submitted the application forms to American where they were reviewed by Ms. Tarver. For reasons she could not specifically recall at trial, Ms. Tarver determined not to invite Mr. Robinson for an interview. She conjectured at trial that it may have been due to his lack of experience as a pilot-in-command, or captain.[2] Because Mr. Robinson's August 28 letter invoking the ADA had been discarded, Ms. Tarver was not aware of Mr. Robinson's protected status at the time she made the determination not to invite him for an interview.

Mr. Robinson was not informed of this determination and on November 14, 1985, sent American another certified letter:

Gentlemen:

As I stated in my letter of August 28, 1985, I am eligible for and desire to be accorded the hiring preference—"right-

---

**2.** It appears from Mr. Robinson's deposition testimony, which the Court admitted into evidence, that the reason for his lack of pilot-in-command time was that he had failed the simulator tests for an upgrade to captain. American, however, did not learn of this until this litigation arose. Plaintiff therefore objected to consideration of this fact on relevancy grounds, as it did not factor into American's decision not to hire Mr.

Robinson. The Court reserved ruling on the objection at trial and admitted the deposition in evidence subject to plaintiff's objection. However, because the Court holds that American has justified its actions on medical grounds, the Court need not reach the relevance of this evidence. The Court notes only in passing that such evidence may be relevant at least to the question of injury.

of-first-hire"—under Section 43 of the Airline Deregulation Act of 1978. A lower Court decision blocking implementation of Section 43 was reversed on appeal on July 16, 1985, by the U.S. Court of Appeals for the District of Columbia Circuit, and the appellate court's mandate giving formal effect to its decision was issued on October 9, 1985.

I meet the eligibility requirements for the hiring preference because:

(a) As of October 24, 1978, I had been employed with Capitol International Airways, Inc. for more than ten years.

(b) I was employed by Capitol on October 24, 1978.

(c) Capitol ceased operations and filed for bankruptcy in 1984.

Documentation to support the above facts can be provided on request as can more detailed references to the law governing "right-of-first-hire".

JE 6.

Upon receipt of this letter, Ms. Tarver consulted with American's legal department and it was determined to invite Mr. Robinson for an interview. On the legal department's advice, Ms. Tarver sent Mr. Robinson a letter on December 2, 1985, inviting him to set up an interview. JE 7. The letter also stated that his "claim of 'right of hire' was not a determining factor" in the decision to pursue his application. *Id.* At trial, however, Ms. Tarver testified that this statement was made with a view toward litigation and that, in fact, the *only* reason Recruitment reversed its decision was Mr. Robinson's invocation of the first right of hire.

Because Ms. Tarver's letter also indicated that American required applicants to possess a valid Federal Aviation Administration ("FAA") First Class Medical Certificate, Mr. Robinson underwent an FAA medical examination on December 11, 1985, to renew his then-expired certificate. He met all the FAA requirements, including

blood pressure for his age group, and was issued a new first class certificate.[3] His actual blood pressure reading, however, is not noted on the face of the certificate and is not part of the record. JE 22. His certificate did indicate he was 70½ inches tall and weighed 204 lbs. *Id.* Certificate in hand, Mr. Robinson called American and scheduled a personnel interview and a medical examination in "Phase I" of American's hiring process.

At the time Mr. Robinson applied, American's hiring process entailed three phases of selection procedures followed by a final hiring decision by a "Pilot Selection Board." Except for the initial personnel interview, the Phase I and II procedures are the province of American's Medical Department and are normally performed by nurses and technicians with doctors playing only a supervisory role. American applies the medical standards of Phases I and II to all initial applicants, including protected employees under the ADA. American applies only the FAA medical standards, however, to its current and returning furloughed pilots.

The standards for some of American's medical tests (*e.g.*, pulmonary function, cholesterol, treadmill stress test) vary according to the applicant's age. American's blood pressure standard, however, unlike that of the FAA, is not scaled by age. Age has historically been a hiring criteria at American. Until 1984, American did not hire pilot applicants over the age of 30.[4] Then, in mid–1984, due to an increase in its demand for pilots, American raised the cutoff to age 40. Finally, in June 1985, for similar reasons American abandoned the age–40 guideline. Since that time, as Ms. Tarver testified, American has "preferred not to go over age 50" in hiring pilots. Tr. at 70 (Oct. 5, 1988).

Phase I of American's hiring process consists of a personnel interview and a "mini

---

3. The FAA medical requirements are set forth in 14 C.F.R. § 67.13, discussed *infra* pages 764–65.

4. American's age-thirty guideline has been upheld as a "bona fide occupational qualification"

under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(f)(1). *Murnane v. American Airlines, Inc.,* 482 F.Supp. 135, 144–48 (D.D.C.1979), *aff'd,* 667 F.2d 98 (D.C.Cir.1981).

medical" examination that includes medical history, laboratory work (*i.e.*, blood and urine analyses), vision and hearing tests, and measuring physical characteristics such as height, weight, and blood pressure. The Phase I test results are listed on a so-called "mini-medical worksheet," which includes a block for listing disqualifying factors and for indicating whether the applicant is "not recommended." The Medical Department notifies the Recruitment Department of its decision to recommend or not to recommend an applicant for further processing by a document known as "Form C630," which may be signed by a doctor or a nurse on behalf of a doctor. The worksheet and underlying test results are not routinely given to Recruitment.

Applicants that survive Phase I are invited back to the Medical Department for Phase II, known as the "major medical" examination. The applicant at that stage is examined by a doctor and subjected to a neurological examination, electrocardiogram, electroencephalogram, X-rays, lung test, and psychological evaluation. Results are ranked numerically. As with Phase I, the Medical Department informs Recruitment of its recommendation on a form C630, without underlying test results.

Those who successfully complete Phase II move on to Phase III, which consists of a flight simulator evaluation and an interview with a panel of retired American Captains. Finally, once this gauntlet of phases is run, the Pilot Selection Board makes the final selection. Moreover, it is only at this stage that American gives effect to the hiring preference for protected employees under the ADA, such as Mr. Robinson.

Mr. Robinson reported to American's Dallas, Texas, facility on December 19, 1985, for his scheduled Phase I processing. He was first interviewed by Richard Lalim of the Recruitment office. Mr. Lalim's evaluation of Mr. Robinson was "Excellent! really friendly. Well qualified." JE 10. Following the interview, Mr. Robinson underwent the mini-medical examination. Among other results, he measured 71 inches tall, weighed 203½ lbs, and had blood pressure readings of 164/100 and 156/98. JE 11. His weight and blood pressure exceeded American's standards and he was not thereafter recommended for further processing beyond Phase I.[5]

American's weight standard is based on a height/weight chart. *See* JE 20. The chart goes up in one-inch increments and American's practice, according to Dr. Wick, Corporate Medical Director, is to "interpolate" for intermediate heights. Thus, the maximum acceptable weight for 71 inches is 201 lbs, for 72 inches is 207 lbs, and for 71½ inches is 204 lbs. Mr. Robinson's height and weight were measured by a nurse. He was weighed on a standard medical balance, without his shoes or jacket.

The maximum acceptable blood pressure reading to pass Phase I of American's hiring process is 150/90.[6] If more than one reading is taken, only one passing reading is required. The two blood pressure readings on Mr. Robinson were taken without letting him rest in between, and the nurse took no further readings, as indicated by her annotation "not pursued" on the mini-medical worksheet. *See* JE 11. American's witnesses stated that the policy of the Medical Department is normally to remeasure blood pressure after giving the applicant a rest, but that this is not done if the applicant has already failed another test, such as weight, as was the case with Mr. Robinson.

On his Phase I test results, Mr. Robinson's age at the time, 45, was noted on the forms on three separate occasions. American's explanation for this practice is that it is used to alert nurses and technicians of the applicant's age so that the age-specific standards can be applied appropriately. The medical tests are not performed by only one staff member and such annotations were used to "pass off" relevant in-

---

5. As noted initially, it is the validity of these standards as true, uniformly applied, bona fide "qualifications" that is principally at issue in this case.

6. At Phase II, which Mr. Robinson never reached, the blood pressure standard is 140/90.

formation for the next test. The Medical Department was also at the time phasing in an automated labeling procedure to save time. The labels reflected the date of the examination, the applicant's name, sex, and age. In Mr. Robinson's case, however, his age had to be noted by hand because it was apparently not available at the time the labels pertaining to him were printed. *See* JE 11.

The Medical Department did not recommend Mr. Robinson for further processing and notified Recruitment of this on a form C630, which, as already noted, did not indicate specific disqualifying factors. On the basis of the Medical Department's negative recommendation, Recruitment on January 6, 1986, sent Mr. Robinson a letter:

Dear Mr. Robinson:

Thank you for participating in the first phase of our pilot recruitment program. We regret to inform you that we are unable to process you further at this time. Although you meet our basic qualifications, our process is highly competitive and many other factors are evaluated.

Your application will be retained in our active files. You may update if you wish and if our needs change, we will re-evaluate your credentials.

JE 13. Ms. Tarver, however, testified that this was a "form" letter.

Mr. Robinson responded by submitting his "family tree medical history" in a January 21, 1986, letter to Dr. Brawley of American's Medical Department, stating, "[s]ince this may become involved in a law suit, I would like to have the revised history, which I enclose, re-evaluated and added to my records." JE 14. In response to this letter, the Medical Department reviewed again Mr. Robinson's medical file and determined not to change the negative recommendation. A new form C630 to this effect was sent to Recruitment, dated January 30, 1986, and signed by a nurse on behalf of Dr. McCall of American's Medical Department. JE 12.

Mr. Robinson on March 21, 1986, wrote to Ms. Tarver acknowledging receipt of her January 6 form rejection letter and stating:

"my attorney has advised me to ask you specifically what factors resulted in my not being hired. Unless I receive your answer within ten days, I will ask my attorney to proceed with the law suit." JE 15. Upon receipt of this ultimatum, Ms. Tarver responded on March 31, with the following letter:

Dear Mr. Robinson:

Your disappointment at not being selected is understandable.

As I stated in my previous correspondence, you meet our minimum technical qualifications, however, you are not as competitive as those pilots we are presently selecting.

We wish you the best in your pursuit of a career in aviation.

JE 16. Ms. Tarver testified that she may have consulted the Legal Department before writing this letter, as is her usual practice when a lawsuit is threatened. She also testified, in response to questioning by the Court, that she would have reviewed Mr. Robinson's file before writing the letter and would therefore have been aware that the Medical Department had not recommended him; but that it is Recruitment's policy not to advise an applicant specifically why he or she is rejected.

Mr. Robinson thereafter filed the present lawsuit on June 17, 1986. It is stipulated that the class of pilots hired by American on July 14, 1986, of which Mr. Robinson would have been a member had he been hired, was composed entirely of pilots who were not protected under the ADA. It is also stipulated that from June 1985 through December 1985 American hired 10 pilots over 40, 4 of whom were 45 or older; in 1986, American hired 118 pilots over 40, out of 1,008 hired, 20 of whom were 45 or older; and in 1987, through mid-July, American hired 106 pilots over 40, out of 516 hired, of whom 29 were 45 or older.

## II. CONCLUSIONS OF LAW

The duty-to-hire imposed by Section 43 of the ADA provides that

[e]ach person who is a protected employee of an air carrier [covered by the Act] ... shall have first right of hire, regard-

less of age, in his occupational specialty, by any other [covered] air carrier hiring additional employees.... Each such air carrier hiring additional employees shall have a duty to hire such a person before they hire any other person, except that such air carrier may recall any of its own furloughed employees before hiring such a person.

49 U.S.C.App. § 1552(d)(1).

The Court has already held, along with every other court that has considered the issue, that an implied private right of action exists for violations of the Employee Protection Program of the ADA. *Robinson v. American Airlines, Inc.*, No. 86–1674, slip op. at 2, 1987 WL 49708 (D.D.C., Nov. 17, 1987); *see also McDonald v. Piedmont Aviation*, 625 F.Supp. 762, 766 (S.D. N.Y.1986), *cited with approval in Alaska Airlines*, 107 S.Ct. at 1482 n. 9; *Crocker v. Piedmont Aviation*, 696 F.Supp. 685, 688 (D.D.C.1988); *Long v. Trans World Airlines, Inc.*, 704 F.Supp. 847, 853 (N.D.Ill. 1989).

The Secretary of Labor was also given the authority in Section 43(f) of the ADA, 29 U.S.C.App. § 1552(f), to issue implementing regulations, and those regulations were finally issued in late 1985. *See* 53 Fed.Reg. 53094 (1985); 29 C.F.R. §§ 220.-01–.51 (1987). The United States Supreme Court has aptly remarked, however, that "[t]he language of these provisions is sufficiently unambiguous to notify carriers of their responsibilities and sufficiently detailed to require little further action on the part of the Secretary." *Alaska Airlines v. Brock*, 480 U.S. 678, 107 S.Ct. 1476, 1482, 94 L.Ed.2d 661 (1987). Nonetheless, the Secretary has exercised the authority to issue implementing regulations and those regulations are entitled to deference by this Court.

In particular, the implementing regulations contain provisions directly relevant to this case. Section 220.11(a) provides that "each designated employee must satisfy all qualifications or other requirements established by the hiring carrier (subject to the limitations contained in § 220.21)." 29

C.F.R. § 220.11(a). Section 220.21, in turn, provides that

[a] covered air carrier shall be entitled to apply any prerequisites or qualifications determined by it for any vacancy, except that, solely with respect to the duty to hire created by the Act, a covered air carrier shall not be entitled to limit employment opportunities for designated employees on the basis of:

(1) Initial hiring age (provided that such prohibition shall not be applicable to retirement ages applicable to all of any class or craft of such air carrier's employees)....

*Id.* at § 220.21(a). Under the regulations, therefore, a carrier may apply any legitimate "prerequisites," "qualifications" or "other requirements" in screening protected employees—the only prohibited criteria is initial hiring age. Beyond this, however, the regulations provide no guidance on how the Court is to analyze this case.

The Court finds that the most helpful mode of analysis is a modified version of the prima-facie case rules for discrimination cases under Title VII, or the ADEA. *Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *modified in Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a prima facie case, therefore, an ADA plaintiff must show 1) that he is a protected employee under the Act; 2) that he met the carrier's minimum non-competitive hiring prerequisites, qualifications or other requirements (excluding initial hiring age) for employees in his occupational specialty; and 3) that the carrier failed to hire him before hiring any other person except one of the carrier's own furloughed employees. The carrier may then rebut the plaintiff's case by coming forward with evidence of a legitimate "non-discriminatory" reason for its employment decision (*i.e.*, one not based on initial hiring age, or "competitiveness" vis-a-vis non-protected applicants). Finally, plaintiff may then defeat the carrier's rebuttal by proving that the carrier's reason is in fact a "pretext."

As noted initially, having denied American's motion for summary judgment, the sole issue for the Court is whether American's weight and blood pressure standards are legitimate medical qualifications, or merely a pretext for rejecting applicants such as Mr. Robinson on the basis of initial hiring age or his competitiveness. Plaintiff attacks American's standards as pretextual on several grounds, which boil down to two: 1) they are subjectively and inconsistently enforced; and 2) they go beyond the minimum FAA requirements. As discussed below, these arguments fail both factually and legally.

■ Most importantly, plaintiff was unable to disprove American's contention that it has "never" hired an applicant who failed either its weight or blood pressure standards at Phase I. Plaintiff, albeit without the ability to review every personnel file at American, could not prove a single instance in which an applicant exceeding either standard was hired. Every file in the record shows at least one blood pressure reading of 150/90 at Phase I and 140/90 at Phase II, and a weight within American's chart.[7] On this point, the Court was troubled only by the fact that Mr. Robinson was not given an opportunity to rest and lower his blood pressure as American has done with many other successful applicants. The Court, however, accepts as credible American's explanation that further blood pressure readings are only taken when the applicant is not disqualified on other grounds, and that no additional readings were taken on Mr. Robinson because he had already exceeded the weight requirement.

Plaintiff makes a stronger showing, however, that age may still be considered as a subjective hiring criteria by American. On several files in the record the youthfulness of the applicant was noted: Scott A. Baird ("very young and unsophisticated"); Clinton A. Beedle ("Air Force Pilot, looks very young, stable, good candidate"); Brenton R. Boyd ("youthful"); Andrew T. Holbert ("Good candidate, young, has himself under control"); Randy B. Keever ("Appears to be good candidate, shy, *young*") (emphasis in original). JE 19. Moreover, Mr. Robinson's age was noted several times on his Phase I medical test forms. Although the Court accepts in principle American's explanation that his age was noted solely for the purpose of medical tests that were age-specific, given American's history of considering age in hiring, the Court is concerned about the reasonable inferences that may be drawn from this evidence. Nonetheless, the Court finds that the preponderance of the evidence shows that American would have rejected Mr. Robinson regardless of his age due to his failure to pass its weight and blood pressure standards. *Cf. Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

■ Furthermore, there is no evidence that American's medical screening was influenced by its recruitment priorities or that medical factors were weighed competitively. Nor is there any evidence that Recruitment has authority to override a negative medical evaluation. Upon direct questioning by the Court, American's Corporate Medical Director testified that American "would not take Charles Lindberg himself if he were still around if he did not meet our standards." Tr. at 165 (Oct. 5, 1988). Ms. Tarver adequately explained her ill-considered use of the term "competitive" in her correspondence with Mr. Robinson, and the Court finds credible her testimony that he was rejected solely because of the Medical Department's negative recommendation. Finally, it is permissible for American to implement the ADA hiring preference only at the final phase of its hiring process, as long as competitive standards are not applied to protected employees at any stage.

■ Plaintiff's remaining line of attack is that American has not justified its application of more stringent weight and blood

---

7. On the weight standard, plaintiff offers the example of one applicant hired by American who was 71¼ inches tall and weighed 202½ lbs. JE 19 (Savage). However, accepting American's representation that it interpolates for fractional measures, this reading is, in fact, within the weight chart.

pressure requirements than the FAA. The FAA has no weight requirements for a first-class medical certificate. *See* 14 C.F.R. § 67.13. The FAA blood pressure requirements for a first class medical certificate are as follows:

Unless the adjusted maximum readings apply, the applicant's reclining blood pressure may not be more than the maximum reading for his age group in the following table:

| Age group | Maximum readings (reclining blood pressure in mm) | | Adjusted maximum readings (reclining blood pressure in mm)[1] | |
|---|---|---|---|---|
| | Systolic | Diastolic | Systolic | Diastolic |
| 20–29........ | 140 | 88 | ....... | ....... |
| 30–39........ | 145 | 92 | 155 | 98 |
| 40–49........ | 155 | 96 | 165 | 100 |
| 50 and over | 160 | 98 | 170 | 100 |

[1] For an applicant at least 30 years of age whose reclining blood pressure is more than the maximum reading for his age group and whose cardiac and kidney conditions, after complete cardiovascular examination, are found to be normal.

14 C.F.R. § 67.13(e)(4). Under FAA standards, therefore, blood pressure is scaled according to age.

There is no requirement, however, that American adopt the FAA medical standards. Air carriers like American have an independent duty "to perform their services with the highest possible degree of safety in the public interest." 49 U.S.C.App. § 1421(b). In discharging this duty American is free to require more stringent medical qualifications than the FAA, including weight and blood pressure. The FAA requirements are considered bare minimums. Furthermore, Dr. Reighard, American's expert, and a former Federal Air Surgeon who was involved in drafting the 1959 FAA standards at issue, testified without contradiction that the "FAA condoned and supported" the practice of some airlines of requiring stricter standards than the FAA. Tr. at 70 (Oct. 6, 1988).

American takes the position, contrary to the FAA's sliding scale, that blood pressure should not vary significantly with age. Dr. Wick, American's Corporate Medical Director, and an expert in aviation medicine, testified that "[e]ssentially and ideally an individual's blood pressure ought to be 120 over 80 all his life.... [and] at 140 over 90 it's time to start treating anyone, almost regardless of his age." Tr. at 169 (Oct. 5, 1988). The Court takes judicial notice that this position is in accord with the national medical experts. *See* Public Health Service National Institutes of Health, U.S. Department of Health and Human Services, The 1988 Report of the Joint National Committee on Detection, Evaluation, and Treatment of High Blood Pressure 3 (blood pressure of 140/90 indicates "mild hypertension" and "borderline isolated systolic hypertension" in adults age 18 and older). There is, therefore, no basis for finding, as plaintiff suggests, that American's blood pressure standards are intended to disproportionately disqualify older applicants as a surrogate for American's recently-abandoned hiring age criteria.

American also reasonably believes that stricter standards reduce the chances of in-flight heart attacks or other cardiovascular failures. Although "safety" may not be used as a talismanic justification for otherwise arbitrary employment decisions, "the airline industry must be accorded great leeway and discretion in determining the manner in which it may be operated *most safely." Murnane v. American Airlines, Inc.,* 667 F.2d 98, 101 (D.C.Cir.1981) (emphasis in original), *cert. denied,* 456

U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982). Courts simply "do not possess the expertise with which, in a cause presenting safety as the critical element, to supplant their judgments for those of the employer." *Id.*, 667 F.2d at 101. Furthermore, as the Court noted initially, in enacting the ADA Congress specifically stated that its implementation should "result in no diminution of the high standard of safety in air transportation...." 49 U.S.C.App. § 1307(a).

American's safety rationale is not undermined by the fact that it requires only the FAA standards for its current and returning furloughed pilots. All its pilots will have had to meet American's standards at least once upon hiring. American feels that the current pilots' experience with the airline compensates for the lower medical standards and maintains the safety margin. American is also apparently precluded by applicable collective bargaining agreements from requiring more than the FAA minimums of its existing and returning furloughed pilots. Furthermore, protected employees and furloughed employees are not similarly situated, as the ADA by its terms authorizes airlines to treat its furloughed pilots more favorably than protected employees under the Act. In sum, American has a rational basis for applying only FAA medical standards to its current and returning furloughed pilots while applying its own more stringent standards to initial hires, including protected employees.

## CONCLUSION

The Court is satisfied that American rejected plaintiff for legitimate safety-based medical reasons. Despite this conclusion, however, the Court sympathizes with plaintiff's plight, as the "first right of hire" has proved rather illusory in his case. An order in accordance with this Memorandum Opinion shall be issued herewith.

## ORDER

In accordance with the Memorandum Opinion issued herewith, it is this 31st day of May, 1989,

ORDERED THAT judgment shall be entered in favor of defendant and this case DISMISSED with prejudice.