**Cecil Alfred ROBINSON, Jr., Appellant**

v.

**AMERICAN AIRLINES, INC.**

No. 89–7161.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 21, 1990.

Decided July 27, 1990.

Pierre Murphy, with whom Robert M. Beckman and David M. Kirstein, Washington, D.C., were on the brief, for appellant.

Gregory S. Lewis, Washington, D.C., for appellee.

Before BUCKLEY, Circuit Judge, ROBINSON, Senior Circuit Judge, and WILLIAM H. TIMBERS,* Senior Circuit Judge for the Second Circuit.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The Airline Deregulation Act of 1978 provides for the preferential hiring of certain categories of employees who may have lost their jobs as a result of the deregulation of the industry. Cecil Alfred Robinson brought suit against American Airlines, Inc. on a claim that he had been denied the right of first hire provided him by the Act. Because there is ample record evidence supporting United States District Judge Thomas F. Hogan's finding that Robinson was rejected on grounds permitted by the Act, we affirm.

## I. BACKGROUND

### A. Legal Framework

To assist airline employees who might be dislocated as a result of airline deregulation, Congress established an Employee Protection Program ("EPP") as part of the Act. *See Alaska Airlines, Inc. v. Brock,*

480 U.S. 678, 680–81, 107 S.Ct. 1476, 1478–79, 94 L.Ed.2d 661 (1987). Section 43(d)(1) of the Act provides in relevant part as follows:

> *Each person who is a protected employee* of an air carrier which is subject to regulation by the Civil Aeronautics Board *who is furloughed or otherwise terminated* by such an air carrier (other than for cause) prior to the last day of the 10–year period beginning on October 24, 1978, *shall have first right of hire, regardless of age, in his occupational specialty, by any other air carrier hiring additional employees* which held a certificate issued under section 1371 of this Appendix prior to October 24, 1978. *Each such air carrier hiring additional employees shall have a duty to hire such a person before they hire any other person,* except that such air carrier may recall any of its own furloughed employees before hiring such a person.

49 U.S.C.App. § 1552(d)(1) (1982) (emphasis added).

The Act authorized the Department of Labor to issue "such rules and regulations as may be necessary for the administration" of the EPP. *Id.* § 1552(f)(1). Pursuant to this authorization, the Department promulgated regulations that permitted covered carriers to apply their own non-age-based qualification standards and prerequisites when considering whether to hire a protected employee. 29 C.F.R. §§ 220.11(a), 220.20(a), 220.21 (1989). In *Alaska Airlines, Inc. v. Brock,* No. 86–5042, mem. op. at 1 (D.C.Cir. Jan. 29, 1987) [809 F.2d 930 (table)], we upheld these regulations generally as "clearly reasonable, consistent with the terms of the [Act], and within the Secretary's statutory authority." Robinson does not challenge their validity.

### B. Factual Background

From 1968 until November of 1984, Robinson logged over 10,500 hours of flight time as a commercial airline pilot for Capi-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

tol International Airways, Inc., an air carrier subject to regulation by the Civil Aeronautics Board. In November 1984, Capitol declared bankruptcy and permanently furloughed Robinson. One year later, Robinson applied for a position with American, asserting his rights as a protected employee under the EPP. American invited Robinson to participate in its application process. Prior to appearing for his appointment with American, Robinson renewed his FAA medical certificate, meeting all of the FAA's medical requirements.

Evidence at trial established that American employs a three-phase application process when hiring new pilots. Phase I consists of a personnel interview and a preliminary medical examination in which the applicant's blood pressure, height, weight, and other physical characteristics are measured and other tests performed. Applicants who do not meet any one of the medical standards established by American are disqualified from further processing and are rejected. Candidates who survive this preliminary examination move on to Phase II, which consists of a comprehensive medical examination and a personality test. On the basis of medical criteria established by American, Phase II applicants are ranked on a scale from one to five; those who score four or five move on to Phase III. In this final phase, applicants undergo a flight simulator evaluation and an interview with a panel of retired American captains. Applicants with protected status under the EPP who successfully complete Phase III are hired, and the balance of new hires are selected from among the nonprotected applicants who complete Phase III. American thus does not afford a protected applicant his right of first hire unless he successfully completes all three phases of the application process.

At his Phase I examination, Robinson's height and weight were measured at 71 inches and 203.5 pounds, respectively. His blood pressure was measured at 164/100 (reclining) and 156/98 (sitting). Robinson weighed 2.5 pounds more than the maximum allowed on a height/weight proportion table used by American as a qualification standard. His blood pressure also exceeded American's Phase I limit of 150/90.

About three weeks after Robinson's examination, he received a form letter from American's Manager of Pilot Recruitment informing him that although he met American's "basic qualifications," he would not be offered a position because the hiring "process [was] highly competitive and many other factors [were] evaluated." *Robinson v. American Airlines, Inc.,* 722 F.Supp. 757, 762 (D.D.C.1989) ("Mem. op."). After inquiring why he had been rejected, Robinson received another letter stating that although he met the company's "minimum technical qualifications," he was "not as competitive as those pilots" American was "presently selecting." *Id.* at 762. The class of pilots eventually hired by American from this round of processing did not include anyone with protected status under section 43 of the Act.

Robinson filed this suit alleging that American's refusal to hire him violated his right of first hire under section 43 of the Act. After a two-day bench trial, Judge Hogan found the facts set forth above and noted that Department of Labor regulations authorized American to apply its "legitimate 'prerequisites,' 'qualifications' or 'other requirements'" to screen the applications of protected employees. *Id.* at 15–16. He concluded that Robinson's employment application was rejected on the basis of *bona fide* hiring qualifications, and that Robinson was therefore not improperly denied the right of first hire guaranteed by section 43 of the Act. Accordingly, he granted judgment for American and dismissed Robinson's complaint with prejudice. *Robinson v. American Airlines, Inc.,* 722 F.Supp. 757 (D.D.C.1989). Robinson appeals.

## II. Discussion

■ Robinson contends that the district court's findings on certain key issues of fact are clearly erroneous. A trial court's findings of fact will not be found clearly erroneous unless the court's account of the evidence is implausible in view of the entire record and it is apparent that its findings

are clearly mistaken. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Specifically, Robinson argues that American's height/weight standard and Phase I 150/90 blood pressure standard are not *bona fide* safety-based medical qualifications. He points to the fact that these standards are stricter than those required by the FAA and are not applied by American to its current or furloughed pilots. Robinson also argues that the Phase I criteria were not consistently applied by American, that his blood pressure was not properly tested, and that the court improperly ignored evidence that he met American's basic qualifications but was not hired because he was not as competitive as other applicants. In support of his contentions, Robinson essentially reargues the evidence presented at trial. We conclude, however, that the district court's findings are amply supported by the record and entirely plausible in view of the evidence. We are thus unpersuaded that the court committed clear error in judging the facts.

The Department's regulations provide that a protected employee is not entitled to a right of first hire unless he meets all of the airline's non-age-based qualifications and prerequisites. 29 C.F.R. §§ 220.11(a), 220.21(a). Under these regulations, an airline may apply any of its employment criteria to the hiring of protected individuals so long as they do not limit employment opportunities on the basis of age or seniority or recall rights with other airlines. *Id.* § 220.21(a). Although the regulations became effective shortly *after* Robinson was rejected, and therefore are not directly controlling, they nevertheless represent an interpretation of section 43 by the agency expressly charged by Congress with that responsibility. As such, they are entitled to deference unless inconsistent with the language of the statute. *See generally Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

■ The district court found that American's height/weight and blood pressure standards were legitimate hiring qualifications that were objectively applied to all new applicants for pilot positions. Mem. op. at 764–66 [809 F.2d 930 (table)]. There was no evidence that any pilot applicant who did not meet them had ever been hired, or that the standards were not applied uniformly to all applicants.

American presented evidence establishing that the purpose of its height/weight and blood pressure standards was to screen out individuals who presented the risk of being incapacitated by a heart attack while piloting an aircraft. In view of the substantial obligation of an airline to operate with "the highest possible degree" of care, *see* 49 U.S.C. App. § 1421(b) (1982), the requirement that pilot applicants meet such medical standards is hardly surprising. FAA regulations require airlines to take into account "personal characteristics that could adversely affect safety" in determining pilot competency. 14 C.F.R. § 121.413(a)(4)(ii) (1990). Furthermore, that American's criteria exceed the FAA's minimum requirements is irrelevant. An airline is free to impose more stringent requirements, and "must be accorded great leeway and discretion in determining the manner in which it may be operated *most safely*." *Murnane v. American Airlines, Inc.*, 667 F.2d 98, 101 (D.C.Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982) (emphasis in original).

It is also irrelevant that standards applied by American to its current or furloughed pilots are less stringent than those applied to new applicants. Section 43 of the Act permits an air carrier to recall its own furloughed pilots before hiring protected applicants. Furthermore, American offered a safety rationale, unrebutted by Robinson, to explain why application of lesser standards to its existing pilots was acceptable. In American's judgment, pilots who are familiar with American's unique safety procedures by virtue of their experience in American cockpits, but who might no longer meet all of its initial-hire medical criteria, present less of an overall safety risk than new pilots who, while meeting the initial medical standards, are unfamiliar with American's safety procedures.

Robinson has no better luck in his attempt to undercut the district court's conclusion, based on the record, that American's height/weight and blood pressure standards were *bona fide* hiring qualifications that were consistently applied to all applicants. Robinson points to one candidate hired by American who was only a quarter inch taller than Robinson and weighed only one pound less. If, however, one extrapolates from American's table for the additional quarter inch in height, as was American's practice, it becomes clear that the applicant's weight was just equal to the maximum allowable for his height. Robinson also asserts that American's failure to remeasure his blood pressure after allowing him to rest indicates that it did not apply its blood pressure standard to him in an evenhanded way. The evidence establishes that it was American's practice to remeasure an applicant's blood pressure after a period of rest if the initial measurements were above 150/90. But the evidence also shows that it was not American's practice to remeasure the blood pressure if an applicant had failed some other medical standard during the Phase I examination, as was the case here.

Finally, Robinson's assertion that the district court ignored the two letters from American to Robinson, which implied that his application had been rejected based on competitive, discretionary criteria rather than objective hiring qualifications, is simply wrong. The author of the letters, Judy Tarver, testified that they in fact gave no reasons for Robinson's rejection because it was American's policy not to tell applicants why they had been turned down. She also testified that Robinson had been rejected for medical reasons. The district court credited her testimony that Robinson "was rejected solely because of the ... negative recommendation" of American's Medical Department. Mem. op. at 764 [809 F.2d 930 (table)]. As Ms. Tarver's testimony is unrebutted, we have no basis for finding the court's conclusion on this issue clearly erroneous, particularly in view of the "due regard" we must give to its judgment of a witness's credibility. *Anderson*, 470 U.S. at 573, 575, 105 S.Ct. at 1511, 1512; Fed.R. Civ.P. 52(a).

### III. CONCLUSION

As Judge Hogan's factual findings are amply supported by the record, his judgment is

*Affirmed.*