RETA MAGUIRE *vs.* DIRECTOR OF THE OFFICE OF MEDICAID.

No. 11-P-792.

Essex. January 10, 2012. - October 4, 2012.

Present: GREEN, BROWN, & AGNES, JJ.

*Medicaid. MassHealth.*

Discussion of the deferential standard applied by this court when reviewing a decision of the Office of Medicaid regarding a person's eligibility for coverage. [552-553]

A hearing officer of the Office of Medicaid, in determining that the plaintiff lost a period of eligibility for long-term care coverage when she transferred her former residence to her daughter for less than market value, properly interpreted the applicable regulatory framework [553-557], and substantial evidence supported the hearing officer's conclusion that the care provided to the plaintiff by the daughter during the two-year period prior to the plaintiff's admission to a nursing facility did not qualify for the so-called "caretaker child" exemption [557-559].

CIVIL ACTION commenced in the Superior Court Department on November 20, 2008.

The case was heard by *David Lowy*, J., on a motion for judgment on the pleadings.

*John J. Ford* for the plaintiff.

*Kirk G. Hanson*, Assistant Attorney General, for the defendant.

AGNES, J. The question presented by this appeal is whether MassHealth,[1] the agency "responsible for the administration and delivery of health-care services to low- and moderate-income individuals," *Forman* v. *Director of the Office of Medicaid*, 79 Mass. App. Ct. 218, 222 (2011) (citation omitted), made a decision that is supported by substantial evidence and correctly applied the law in determining that the plaintiff, Reta Maguire, lost

---

[1]See generally G. L. c. 118E; 130 Code Mass. Regs. §§ 501.000. The system commonly known as Medicaid originated as Title XIX of the Social Security Act of 1965. *Law* v. *Griffith*, 457 Mass. 349, 350 n.3 (2010).

a period of her eligibility for long-term care coverage when she transferred her former residence, valued at $140,300, to her daughter Karen for one dollar. MassHealth determined that the transfer did not qualify under the "caretaker child" exception found in 130 Code Mass. Regs. § 520.019(D)(6)(d) (2006). As a result, MassHealth determined that Maguire was ineligible for MassHealth benefits for a period of 548 days. This had the effect of forcing Maguire or her family to pay for her care during the ineligibility period. The Office of Medicaid board of hearings (board) affirmed MassHealth's denial of benefits, and Maguire appealed to the Superior Court pursuant to G. L. c. 30A, § 14. A Superior Court judge denied Maguire's renewed motion for judgment on the pleadings, and entered judgment for the defendant holding that there was substantial evidence in the record supporting the decision by the board's hearing examiner upholding the decision made by MassHealth. For the reasons that follow, we agree with the judge that substantial evidence supports the ruling made by the hearing officer that Maguire's transfer did not qualify under the "caretaker child" exception.

*Factual background.* The following facts are based on the hearing examiner's decision on Maguire's appeal of her disqualification for MassHealth long-term care benefits.[2] Maguire was an eighty-eight year old widow when she was admitted to a nursing facility on July 5, 2007. Her daughter Karen had been living with her for the previous two years.[3] On October 24, 2007, Maguire transferred her former residence, a one-bedroom condominium valued at $140,300, to Karen for one dollar.

Karen is one of four children of Maguire. Karen began to live with her mother in 2004. The arrangement was designed to assist Maguire, who was in declining health, and to provide Karen with a place to live at minimal cost. Karen helped her mother with housecleaning, laundry, meal preparation, and taking medications. Bathing of Maguire was done by Karen's sisters Maureen and

---

[2]On June 24, 2008, Maguire appealed to the board. See 130 Code Mass. Regs. § 610.032 (2005). The hearing examiner held three days of evidentiary hearings and issued a forty-four page decision containing a summary of the evidence, findings of fact, and an analysis and application of the relevant legal principles. His findings of fact are supported by substantial evidence.

[3]This issue was contested by MassHealth but ultimately resolved by the hearing examiner in Maguire's favor.

Kathryn. Maureen occasionally slept over at Maguire's home on Saturday evenings. Karen's brother Joseph visited often and spent Sundays with Maguire.

During the relevant years in question, Karen often spent Saturday nights and part of Sunday at her boyfriend's house. Karen also worked at various jobs between 2005 and 2007 and during at least some of the time she was at work while her mother was alone at home.[4] In 2006, Karen worked for Manpower International, Inc., for six months and for other staffing services during the remainder of the year. For at least several months during 2007, Karen worked full time, forty hours per week. In the period "immediately prior to her institutionalization," Maguire spent days at home alone.

Maguire did not require physical assistance with the activity of dressing and undressing during the entire time Karen lived with her. Maguire received assistance from all of her children, including Karen, in getting to her medical appointments. Karen submitted an undated affidavit stating that since she moved in with her mother in 2004, she "had to assist her with many of her activities of daily living." However, "[t]he detailed testimony from Karen's siblings verifies that Karen did not assist her mother with . . . transfers, bathing, toileting, or dressing, but that Karen instead helped with more instrumental homekeeping activities, such as housekeeping, meal preparation, and taking her mother to doctor's appointments." "Karen's entire testimony suggests that she assisted more with housekeeping and cooking related tasks."

There is evidence in the record that Maguire was diagnosed as suffering from some form of dementia,[5] and that during the relevant time period she had periods of confusion and expressed

[4]Our decision to uphold MassHealth's disqualification of the transfer of Maguire's former residence to Karen is based entirely on the requirements of § 520.019(D)(6)(d), and not based on a judgment about the quality of the care provided to Maguire by Karen and her siblings before Maguire's admission to a nursing facility.

[5]We take judicial notice that "[d]ementia is a word for a group of symptoms caused by disorders that affect the brain. It is not a specific disease." U.S. National Library of Medicine, one of the National Institutes of Health established by Congress available at http://www.nlm.nih.gov/medlineplus/dementia. html (last visited October 2, 2012). See Mass. G. Evid. § 201(c) (2012). See also Robinson v. American Airlines, Inc., 722 F. Supp. 757, 765 (D.D.C. 1989)

reluctance to leave her home or to be cared for by persons other than family members.

On July 19, 2007, shortly after Maguire was admitted to a nursing facility, her nurse practitioner wrote a letter to MassHealth in which she stated that Maguire, who had been under her care "for several years," "has diabetes, hypertension, hyperlipidemia and dementia which have progressed over the past three years," and "has required progressive assistance for many of her activities of daily living from her daughter, Karen Maguire[,] over this time period." The letter concludes with the following opinion: "Should she return home from rehab in the future she will never be independent and will continue to require very significant assistance from her family." However, there is no evidence in the record to support the interpretation of this letter placed on it by Maguire, namely, that her inability to live independently in the community extended back in time to the entire period when Karen was living with her.

*Discussion.* 1. *Standard of review.* The Legislature has directed that a deferential standard of review should be applied to administrative agency decisions of this nature based on the agency's "experience, technical competence, and specialized knowledge," and "the discretionary authority conferred upon it." G. L. c. 30A, § 14(7), as appearing in St. 1973, c. 1114, § 3.[6] However, "[d]eference is not abdication. It does not permit

(judicial notice), aff'd, 908 F.2d 1020 (D.C. Cir. 1990); *Garmon* v. *Liberty Life Assur. Co. of Boston*, 385 F. Supp. 2d 1184, 1202 (N.D. Ala. 2004) (same). One of the difficulties with the record in this case is the lack of evidence, testimonial and documentary, about the state of Maguire's medical condition over the two-year period while Karen resided with her and how it affected her day-to-day life, including, in particular, the activities of daily living that are set forth in 130 Code Mass. Regs. § 515.001 (2006). A diagnosis of "dementia," without more, does not permit a determination of a person's specific needs. We understand the challenges faced by a family who must care for a loved one who suffers from dementia, but the law governing this case imposes on Maguire the burden of demonstrating that she qualified for the "caretaker child" exemption. See Code Mass. Regs. § 520.019(D)(6)(d). This, in turn, requires her to establish that without the care provided by Karen she would have had to enter a nursing facility two years earlier than she did.

[6]For example, the "caretaker child" exception that is at the heart of the dispute in this case specifically states that whether the child has provided the level of care required in order to render a transfer of assets permissible is to be determined by MassHealth. See 130 Code Mass. Regs. § 520.019(D)(6)(d).

a detectable 'error of law' by the agency." *Anheuser-Busch, Inc.* v. *Alcoholic Bevs. Control Commn.*, 75 Mass. App. Ct. 203, 209 (2009).

Assessments of the credibility of the witnesses and the weight to be given to their testimony are matters committed to the discretion of the hearing examiner. See *Andrews* v. *Civil Serv. Commn.*, 446 Mass. 611, 617 (2006). This commitment of discretion to the hearing officer does not excuse an appellate court from the duty to ensure that the subsidiary findings made by the hearing examiner are adequate and sufficiently detailed to disclose the basis for and support the ultimate finding. See *McElroy's Case*, 397 Mass. 743, 746 (1986).

"Our deferential standard of review does not permit a court to treat the proceeding [under G. L. c. 30A] as a trial de novo on the record which was before the administrative board. A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514, 528-529 (2007) (citation and quotation omitted). As a result, Maguire has the burden of establishing that the decision made by MassHealth is invalid, and we are obliged to uphold the decision unless it was "[b]ased upon an error of law" or is "[u]nsupported by substantial evidence." G. L. c. 30A, § 14(7)(c), (e). See *Forman*, 79 Mass. App. Ct. at 221.

2. *Whether the hearing examiner applied the regulatory framework correctly.* Maguire objects to several aspects of the manner in which the hearing officer applied the regulatory framework. We hold that the hearing officer properly interpreted this framework. We start with the basic proposition that, generally, the transfer of one's home by a "nursing-facility resident" for less than "fair-market value" during the "look-back period" is deemed a "disqualifying transfer" that results in a loss of eligibility for the payment of services by MassHealth. 130 Code Mass. Regs. § 520.019(C) (2006). "MassHealth has strict limitations on asset transfers made by applicants before applying for these benefits, in order to prevent individuals from giving away their assets to their family and friends and forcing the government to pay for the cost of nursing home care." *Gauthier* v.

*Director of the Office of Medicaid*, 80 Mass. App. Ct. 777, 779 (2011).

One exception to this rule is a transfer to a "caretaker child." 130 Code Mass. Regs. § 520.019(D)(6)(d). Under 130 Code Mass. Regs. § 520.019(D)(6)(d), a transfer of a former principal residence by a "nursing-facility resident" to her child for less than market value during the look-back period is "permissible" provided that "the nursing-facility resident's child . . . [1] was living in the nursing-facility resident's home for at least two years immediately before the date of the nursing-facility resident's admission to the institution, and [2] who, as determined by the MassHealth agency, provided care to the nursing-facility resident that permitted him or her to live at home rather than in a nursing facility."

In order to qualify under the "caretaker child" exemption, Maguire's asset transfer to Karen had to satisfy the requirements of § 520.019(D)(6)(d). Here, there is no dispute with regard to the first prong of the two-part test contained in § 502.019(D)(6)(d). With regard to the second prong, the issue is whether, during the two-year period, in the absence of the care provided by Karen, Maguire would have required a nursing-facility level of care, i.e., that she would have required institutionalization. See 130 Code Mass. Regs. § 515.001 (2007) (defining nursing-facility resident to include "a resident in any institution"). Institutionalization is defined in 130 Code Mass. Regs. § 515.001 as "placement of an individual in one or more medical institutions" for an actual or expected "continuous period of at least 30 days." Medical institutions are, in turn, defined as facilities "providing acute, chronic, or long-term care." 130 Code Mass. Regs. § 515.001 (2002).[7]

The requirement that an applicant seeking the benefit of the "caretaker child" exemption demonstrate that the care she received while at home enabled her to avoid institutionalization is consistent with Federal Medicaid law that imposes the same obligation on an applicant, 42 U.S.C. § 1396p(c)(2)(A)(iv) (2006), and defines "institutionalized" and "noninstitutionalized" care as

---

[7]The regulation further specifies that such facilities "include[] acute inpatient hospitals, licensed nursing facilities, state schools, intermediate-care facilities for the mentally retarded, public or private institutions for mental diseases, freestanding hospices, and chronic-disease and rehabilitation hospitals."

mutually exclusive. Compare 42 U.S.C. § 1396p(h)(3) (an individual is deemed to be "institutionalized" when she is a resident of a nursing facility or inpatient in a medical institution for whom payment is made on the basis of the level of care provided by the nursing facility), with § 1396p(h)(4) (an individual is deemed to be "noninstitutionalized" when she is receiving nonacute services, including personal care services, at home or in a community setting). Thus, a person who receives care in a community setting such as an assisted living facility[8] is not receiving "acute, chronic, or long-term care" and thus is not to be regarded as "institutionalized" or as receiving "institutionalized care." 130 Code Mass. Regs. § 515.001. See note 8, *supra*.[9]

Contrary to Maguire's view, the hearing examiner did not apply the wrong legal standard by making reference to certain provider regulations that define "activities of daily living" in connection with a nursing home's eligibility for Medicaid reimbursement for patient care. See 130 Code Mass. Regs. §§ 456.409(B), 515.001 (1998).[10] Karen filed an affidavit that makes specific reference to helping her mother "with many of her activities of daily living." Although provider regulations such

---

[8]Assisted living facilities must be certified by the Executive Office of Elder Affairs. See G. L. c. 19D, § 3. When the Legislature adopted chapter 19D it inserted the following declaration: "The general court recognizes that assisted living residences are an important part of the spectrum of living alternatives for the elderly in the commonwealth. The general court further recognizes that assisted living residences should be operated and regulated as residential environments with supportive services and not as medical or nursing facilities. In support of the goal of aging in place, the services available in these residential alternatives, either directly or through contract or agreement, are added, increased or adjusted to compensate for the physical or cognitive impairment of the individual while maximizing the individual's dignity and independence." St. 1994, c. 354, § 1. See G. L. c. 19D, § 11. See generally Schwemm & Allen, For the Rest of Their Lives: Seniors and the Fair Housing Act, 90 Iowa L. Rev. 121 (2004) (explaining the differences among independent living, assisted living, and nursing care facilities).

[9]It is not necessary for us to consider the ruling by the hearing examiner that Maguire did not qualify for the § 520.019(D)(6)(d) exemption because Karen did not provide substantially all of her care.

[10]See also G. L. c. 19D, § 1, inserted by St. 1994, c. 354, § 3 ("Assistance with activities of daily living" is defined as "physical support, aid or assistance with bathing, dressing/grooming, ambulation, eating, toileting or other similar tasks"). Compare the definition of "activities of daily living," 130 Code Mass. Regs. § 515.001, and the definition of "assistance with activities of daily living" contained in 130 Code Mass. Regs. § 456.409(B).

as 130 Code Mass. Regs. §§ 456.409(B) and 515.001 were not written to make the determination required by § 520.019(D)(6)(d), they shed light on the functional needs of persons who require institutionalized versus noninstitutionalized care and thus are relevant to cases like this involving a § 520.019(D)(6)(d) determination. Moreover, these regulations are useful in evaluating the level of care actually provided by Karen. It was thus reasonable for the hearing examiner to compare the services Karen testified she actually provided to her mother (cleaning, laundry, preparation of meals, help with taking medications, and sometimes the selection of clothes to wear) with what are regarded as the activities of daily living.[11]

Finally, both parties have cited the Social Security Administration's (SSA) policy manual regarding Medicare part A, as set forth in the SSA's program operations manual system (POMS)[12] supplemental security income (SI) 01150.122C, which contains an exception to the rule against a transferor, who becomes

---

[11]Title 130 Code Mass. Regs. § 456.409(B) defines "[a]ssistance with activities of daily living" to include "the following services:"

> "(1) bathing when the member requires either direct care or attendance or constant supervision during the entire activity;

> "(2) dressing when the member requires either direct care or attendance or constant supervision during the entire activity;

> "(3) toileting, bladder or bowel, when the member is incontinent of bladder or bowel function day and night, or requires scheduled assistance or routine catheter or colostomy care;

> "(4) transfers when the member must be assisted or lifted to another position;

> "(5) mobility/ambulation when the member must be physically steadied, assisted, or guided in ambulation, or be unable to propel a wheelchair alone or appropriately and requires the assistance of another person; and

> "(6) eating when the member requires constant intervention, individual supervision, or direct physical assistance."

[12]According to the SSA's official Web site, available at https://secure.ssa. gov/apps10/ (last visited October 2, 2012), "[t]he POMS is a primary source of information used by Social Security employees to process claims for Social Security benefits. The public version of POMS is identical to the version used by Social Security employees except that it does not include internal data entry and sensitive content instructions."

institutionalized, transferring a home to a son or daughter at less than market value. The policy, POMS SI 01150.122C, provides as follows (subject to exceptions not applicable here):[13]

> "C. Policy — Providing care for the transferor
>
> "The transfer of a home exception requires that the son or daughter (who received the transferred home) provided care that enabled the transferor to reside at home instead of in an institution or facility. Such care is substantial but not necessarily full-time care. A son or daughter is providing care for purposes of this exception if he/she does most of the following for the transferor on regular basis:
>
> "— prepares meals;
>
> "— shops for food and clothing;
>
> "— helps maintain the home;
>
> "— assists with financial affairs (banking, paying bills, taxes);
>
> "— runs errands;
>
> "— provides transportation;
>
> "— provides personal services;
>
> "— arranges for medical appointments;
>
> "— assists with medication."

The Superior Court judge gave appropriate consideration to the relationship between POMS SI 01150.122C and § 520.019(D)(6)(d). In this regard Federal law and Massachusetts law are consistent.

3. *Whether there is "substantial evidence" in support of the findings and rulings made by the hearing examiner.* The hearing examiner ruled that Maguire had not established that from July, 2005, to July, 2007, the two years preceding her admission

---

[13]The policy is available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0501150122 (last visited October 2, 2012).

to a nursing facility, Karen provided her with care that permitted her to live at home "rather than in a nursing facility."[14] 130 Code Mass. Regs. § 520.019(D)(6)(d). The hearing examiner noted that although Maguire's needs were related to the onset of dementia more than they were related to the type of physical limitations often associated with admission to a nursing facility, she still "could have used her assets and/or property, remained in the community, and privately paid for placement in an appropriate Assisted Living Facility for a long period of time." According to the hearing examiner, "the assistance that [Maguire] may have received from Karen and the rest of her children may have allowed them to avoid changing the community setting for [Maguire] to another type of community setting, but may not have prevented any need for '*institutionalization.*' "[15]

The hearing examiner's decision relating to whether the care provided to Maguire by Karen during the two-year period prior to Maguire's admission to a nursing facility qualified for the "caretaker child" exemption is supported by substantial evidence. The hearing examiner was not required to accept the testimony of Karen or her siblings that Maguire could not live safely at home without Karen's presence. The hearing examiner was entitled to credit the evidence that indicated that for at least several months prior to Maguire's move to a nursing facility, Karen was working full time and Maguire was alone for substantial periods of time, and that prior to that Karen was employed, and thus away from her mother's home, on an intermittent basis. In particular, and contrary to the assertion by Maguire, the testimony by Karen and her siblings that Maguire was reluctant and resistant to allowing persons outside her family to care for her does not, even if credited, compel a finding that Maguire could not have been cared for in a community-based setting such as an assisted living facility.

---

[14]The calculation that led the hearing examiner to assess 548 days of ineligibility as a penalty period for the disqualifying transfer is not an issue on appeal.

[15]A family is not without the means to obtain an assessment of a family member's need for institutionalized care prior to the member's date of admission to a nursing facility. As the hearing examiner noted, MassHealth regulations provide a screening mechanism to enable a family to determine that an individual is clinically in need of institutionalized care in advance of his or her admission. See 130 Code Mass. Regs. § 519.007(B) (2005) ("Home and Community-Based Services Waiver").

While in an undated affidavit Karen made reference to performing services for her mother that were comparable to activities of daily living, the hearing examiner found that Karen had not regularly performed such services but, instead, had provided her mother with personal care services such as cleaning, doing laundry, preparing meals, and assisting with taking medications. Although there is some overlap between such services and those that are set forth in POMS SI 01150.122C, the hearing examiner's finding that Karen did not satisfy the requirements of Massachusetts law precludes a finding that she satisfied the requirement set forth in POMS SI 01150.122C that "[a] son or daughter is providing care for purposes of this exception if he/she does most of the following for the transferor on regular basis."

The final item of evidence relied upon by Maguire is the one-page, two-paragraph letter from her nurse practitioner. It was for the hearing examiner to weigh the significance of this letter. It is not accurate to describe the contents of the letter as "uncontroverted" because it must be considered in light of the firsthand accounts of the services provided to Maguire by Karen and her siblings, and the inferences that could be drawn from this testimony about Maguire's condition during the two years when Karen resided with her. It was not unreasonable, therefore, for the hearing examiner to discount the letter's significance because it does not describe Maguire's condition in any detail over the several years preceding her admission to a nursing facility (other than to say her dementia had "progressed" over that period of time), and is vague about the precise nature of the services provided by Karen during that period of time ("[Maguire] has required progressive assistance for many of her activities of daily living from her daughter, Karen . . . , over this time"). Although the fact that the letter was not prepared until after Maguire entered the nursing facility affected the hearing examiner's assessment of its weight, the more significant consideration is its lack of detail. Ultimately, the hearing examiner was not required to credit the nurse practitioner's conclusion that but for the care provided by Karen, Maguire would have required institutionalized care two years sooner.[16]

---

[16]It is unnecessary to consider, and thus we express no view on, the defendant's contention that a nurse practitioner is not qualified to provide an opinion

*Conclusion.* For these reasons, the decision made by the hearing examiner is not based upon any error of law and is supported by substantial evidence.[17]

*Judgment affirmed.*

---

about a patient's medical condition for purposes of the § 520.019(D)(6)(d) exemption. See 130 Code Mass. Regs. § 515.001 (2004) (defining "Competent Medical Authority" as "a physician or psychiatrist licensed by any state, a psychologist licensed by the Commonwealth of Massachusetts, or both," without reference to nurse practitioners).

[17]The plaintiff's request for attorney's fees is denied.